92 Cal.App.3d 682 (1979)
155 Cal. Rptr. 256
In re LYNNA B., a Minor.
DONALD H. et al., Petitioners and Respondents,
v.
GLORADON M., Objector and Appellant.
Docket No. 43561.
Court of Appeals of California, First District, Division One.
May 3, 1979.
*689 COUNSEL
Madeline D. Sager and Mary Ann Villwock for Objector and Appellant.
Adams & Henderson and Lee S. Adams for Petitioners and Respondents.
OPINION
DEAL, J.[*]
Gloradon M. appeals from a judgment declaring her minor child, Lynna B., free from the custody and control of the natural parents under Civil Code section 232, subdivision (a)(7).
On April 5, 1977, Donald and Rosemary H., respondents, on behalf of Lynna, a minor born on December 6, 1970, filed the petition to free Lynna. Respondents had been appointed as guardians of the person of the minor child on August 31, 1973, by the Superior Court for Mendocino County.
A closed hearing was held on June 24 and 30, 1977, and the court filed its memorandum of intended decision on July 1, 1977. No objections to the proposed findings of fact were filed, and on September 14, 1977, the court signed and filed its findings of fact and judgment freeing Lynna from the custody and control of her natural parents. Notice of entry of judgment was mailed to each of the natural parents on November 3, 1977. Gloradon's notice of appeal was timely filed on December 21, 1977. The default of Delbert C., the natural father, was taken, and he does not appeal.
*690 The report of the probation department, prepared pursuant to Civil Code section 233, recommends that the petition be granted and has been made part of the record. Lynna's school report and letters from Dr. Sidney Ganzler, Ph.D., Dr. Richard A. Martin, M.D., and Jean Sullivan are attached to the probation report. Also part of the record are a letter from Elaine Jersild, R.N., public health nurse from Sonoma County, and a letter from Ronald S. Nesset, deputy probation officer from Sonoma County.
Appellant assigns as error (1) the insufficiency of the evidence to support the judgment; (2) the failure of the court to consider less drastic alternatives; and (3) the admission into evidence of privileged and irrelevant information and records.

STATEMENT OF FACTS
Lynna and her twin sister, Dawn, were born prematurely on December 6, 1970; the birth certificates indicate that the father was unknown. At the time, Gloradon was living in Mendocino County with her mother and a brother. Lynna was born with a congenital heart defect, and Gloradon became overwhelmed by caring for this sick infant along with Dawn and an older child, Eric, born on December 7, 1968. After discussing her problems with Dr. Waring, Gloradon suggested a temporary placement of Lynna in another home. Dr. Waring contacted Jean Sullivan, a social worker with the Mendocino County Department of Social Services, Child Protective Services Division. Sullivan arranged for a voluntary placement of Lynna with respondents, who "had a special talent with children who had physical disabilities." Respondents had been licensed since 1964 as foster parents to have a maximum of six children; they have three children of their own, the youngest of whom is fifteen.
On May 26, 1971, Lynna was released from the hospital to the respondents. She was to remain with them until she had developed sufficient stamina to undergo corrective heart surgery and had recuperated. Gloradon visited Lynna on June 4, 1971, for the first time, for about an hour and a half. Mrs. H. kept a diary on each of her foster children and regularly logged the contacts by Gloradon, who was authorized by Jean Sullivan to visit Lynna once a week. In 1971, Gloradon further visited Lynna on June 11, June 26, July 9, July 16-19, August 13, September 24, October 12 and December 24. With the exception of the three days, all the visits were in the home of the respondents, who accommodated Gloradon's plans for visitation "day or night." Jean *691 Sullivan supervised the placement of Lynna with the respondents by regular visits, usually two or three times a month, during the entire time that Lynna has been with them. In the latter part of 1971, Gloradon moved to Sonoma County to live in her brother's house, about an hour's drive from the respondents' residence. Respondents and Jean Sullivan had a difficult time trying to contact Gloradon, particularly after she moved to Sonoma County. Gloradon testified that even though she would go away for a few days at a time, she always left a number where she could be reached.
In 1972, Gloradon visited Lynna three times: May 31, August 5, and October 9; she called on March 20 and on November 24. On December 9, when Lynna was ready for surgery, Mrs. H. tried to reach Gloradon through her mother, who finally located Gloradon through the sheriff's office. Gloradon returned the call and, as agreed, she came to Mendocino County on January 12, 1973, to sign the necessary medical consents.
On January 25, 1973, Lynna's heart surgery was performed at Stanford Hospital. Gloradon chose not to be present, and Mrs. H. had a message left with her mother when the surgery had been successfully completed. Respondents stayed in Palo Alto for about two weeks to be near Lynna during this period. There was no contact by Gloradon until April 9, 1973, when she visited Lynna at respondents' home. Gloradon telephoned on April 13, May 11, and on May 20 at which time Mrs. H. told her that Lynna was ready to go with her. Gloradon denies that she was told Lynna could go with her. Gloradon telephoned on July 18, and October 15; she visited on September 3 and on September 20, with friends, for about five minutes. On August 31, 1973, respondents were appointed guardians of the person of Lynna; they wanted the appointment because of their inability to reach Gloradon for medical consents when Lynna needed treatment. Gloradon gave her consent which was motivated, at least in part, by her fear that Lynna would be made a dependent ward of the Sonoma County Juvenile Court as Eric and Dawn had been in July 1973. Gloradon testified that she had had no legal advice and did not understand the import of the guardianship proceedings.
There is some conflict about the reasons for the 1973 dependency proceedings for Eric and Dawn. Tension among Gloradon's family members had mounted as a result of the terminal illness and funeral of a brother. Wanda, a sister, testified. She was "angry at" her mother, brothers and sisters for not providing proper care for the ill brother. Gloradon had left Eric and Dawn for a few days, and Wanda called the *692 welfare department to obtain medication for Dawn, who suffered from epileptic seizures; Gloradon was "running around" and had left the children without proper medication and without a number where she could be reached. The welfare department worker questioned Wanda about Gloradon's "neglect of the children," and the dependency proceedings resulted. Gloradon testified that "I couldn't stand the pressure of attending the funeral, ... [s]o I hired a baby sitter to stay with my children, and I was going to go and think about it.... [M]y sister called and said that I deserted the children."
On November 23, 1973, the Sonoma County Juvenile Court placed Eric and Dawn with the respondents after the placement with the grandmother did not work out. Eric remained with respondents until June 20, 1975; Dawn remained with them until January 23, 1976. Lynna and Dawn fought with each other for about two months; thereafter the three children adjusted well with each other. Gloradon spent Christmas 1973 with the three children at respondents' home.
During 1974, Gloradon visited the children 26 times which complied with the twice-a-month visitation schedule allowed by Sonoma County; she usually took them out of respondents' home. Gloradon moved in with the parents of Jim M. around January 1974, and in February, she and Jim were married. Their first child, David, was born in October 1974. Gloradon and Jim took Eric, Dawn and Lynna for a two-week visit during Christmas 1974. Respondents were again considering the return of Lynna to her mother, but the bruises on Dawn after the children were returned from Christmas vacation changed their thinking. The physician who examined Dawn reported the abuse to the child protective services, and termination of dependency for Eric and Dawn was postponed.
From January 1, 1975, until June 20 when Eric was returned to his mother, there were five visits and four calls from Gloradon. After Eric left, Lynna refused to go out with her mother, apparently out of fear that she would not be returned to the respondents. Respondents sought professional counseling from several sources about Lynna's refusal to go with her mother and were advised by each not to force the child. From June 1975 until January 23, 1976, when Dawn was returned to her mother, Gloradon had nine visits out of the home with Dawn; she saw Lynna on each of these occasions.
In 1976, from January 23 when Dawn was returned until December 31, Gloradon telephoned Lynna five times and visited twice: On December 4 *693 when Mrs. H. had a birthday party for Eric, Dawn and Lynna, and on Christmas when Lynna spent the day with Gloradon's relatives. Gloradon testified that she and Jim were having financial problems in 1976. He was out of work and being supported by Social Security; their car was "lousy" and she had no transportation. She was upset by visiting Lynna in respondents' home with the other children running around; Mrs. H. would not force Lynna to go with her, and she was told that she couldn't take Lynna if the child didn't want to go. Gloradon and Jim's second child, Jacob, was born on April 13, 1976.
In 1977, Gloradon called on April 11, when she was served with "the papers." She also testified that she had telephoned a number of times during the years, but that messages were taken by the mother of Mrs. H. and the calls weren't returned. Mrs. H. refuted this.
Respondents filed the petition to free Lynna because "they wanted what was best for Lynna" and were worried about the lack of stability in the arrangement. Their action was triggered by a conversation between Mrs. H. and Gloradon in December 1976 when Gloradon stated that "she had heard if she could find a couple that wanted to adopt Lynna she could sign papers and there would be nothing I could do about it.... I might never see her again...." Gloradon testified that she was discussing the possibility of having her husband adopt all three children.
Respondents love Lynna and want to take care of her as their own. They would continue to allow her to visit with her mother and natural family. Gloradon testified that she had always wanted Lynna to be returned to her and that she had delayed at first because of her concern for Lynna's health and later because of her financial inability to retain counsel. Gloradon's sister, Wanda, testified that Gloradon had settled down and was a fine mother. Jim M. testified that he does not distinguish Eric and Dawn from his natural children, David and Jacob, and that he would feel comfortable with Lynna. He believes that Gloradon is capable of being a good mother to all five children. He has been employed since April 1977 and is grossing $711 per month. They receive AFDC benefits for Eric and Dawn of $56 a month. The Sonoma County probation officer reported that Jim and Gloradon have lived in a rented home since October 1975 and that the home is small, but adequate to accommodate another child.

*694 SUFFICIENCY OF THE EVIDENCE
(1) The judgment is based on Civil Code section 232, subdivision (a)(7)[1] which specifically requires that (1) the child must have been in a foster home under the supervision of certain described agencies for two consecutive years; (2) there must be clear and convincing evidence[2] that a return of the child to the parents would be detrimental to the child; and (3) there must be clear and convincing evidence that the parents are unable to provide a suitable home and family relationship. (See In re Norma M. (1978) 77 Cal. App.3d 110, 115 [143 Cal. Rptr. 412]; cf. In re Carmaleta B. (1978) 21 Cal.3d 482, 491 [146 Cal. Rptr. 623, 579 P.2d 514]; and In re Marcos S. (1977) 73 Cal. App.3d 768, 783 [140 Cal. Rptr. 912], which do not specifically apply the clear and convincing evidence standard to the third requirements.)
(2), (3) Civil Code section 4600, which governs "any proceeding where there is at issue the custody of a minor child," is also applicable. The doctrine preferring parental custody was not affected by the enactment of section 4600 except to focus "attention not on the unfitness of the parent but the detriment to the child." (In re B.G. (1974) 11 Cal.3d 679, 698 [114 Cal. Rptr. 444, 523 P.2d 244].)
(4a) Appellant asserts that there is not substantial evidence to support the findings of the trial court and the judgment must be reversed. We disagree.
*695 (5) The rules of appellate review of judgments in proceedings to free minors from parental custody and control have been restated, recently in In re Marcos S., supra, 73 Cal. App.3d 768, 781: "`"It is neither the duty nor the right of this court to resolve conflicts in the evidence, pass on the credibility of the witnesses, or determine where the preponderance of the evidence lies. These are all matters to be decided by the trier of fact in the court below. The power of any appellate court commences and terminates with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of respondent on appeal and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. Where there is more than one inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trier of fact. All evidence favorable to respondent is assumed true and the unfavorable is discarded. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." [Citations.]'" (6) Substantial evidence is defined in Estate of Teed (1952) 112 Cal. App.2d 638, 644 [247 P.2d 54]: "[I]f the word `substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with `any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be `substantial' proof of the essentials which the law requires in a particular case."
Appellant's first assignment of error is that Lynna, at the time of trial, had not "been cared for in [a] foster [home] under the supervision of the juvenile court, the county welfare department or other public or private licensed child-placing agency for two or more consecutive years." She contends that the order appointing respondents as guardians of the person of Lynna on August 31, 1973, terminated the foster placement and substituted probate court supervision for that of the juvenile court and the welfare department.
A petition under Welfare and Institutions Code section 300 to declare Lynna a dependent ward of the juvenile court was never filed, and her voluntary placement with the foster parents continued until the order for guardianship. Although the guardianship technically placed Lynna under the supervision of the probate court, she continued to be supervised, as appellant concedes, by the department of social services (DSS) in the person of Jean Sullivan, a social worker with the child protective services division. The DSS is an agency of the "welfare department" (see Welf. & *696 Inst. Code, § 272) and qualifies under Civil Code section 232 as a supervising agency.
(7a) Appellant has cited no cases, and we can find none, holding that appointment as guardian terminates the status of the petitioner as a foster parent. We have determined that guardianship does not change the nonbiological relationship between foster parent and child any more than it would change the blood relationship between a relative and the child. (8) A foster parent has been defined as "one who, although not legally related to the child by direct parental blood ties, nor decreed a parent in formal adoption proceedings, assumes the role of parent." (Katz, Legal Aspects of Foster Care (1971) 5 Family L.Q. 283, 285 (ABA Section of Family Law); cf. In re Antonio F. (1978) 78 Cal. App.3d 440, 453 [144 Cal. Rptr. 466], holding that placement of the children in the home of an aunt does not qualify as foster care under Civ. Code, § 232, subd. (a)(7).) (7b) From reading various statutes, it appears that a foster parent can wear two hats, e.g., Probate Code section 1440 provides that the petition for appointment of a guardian of the person of a minor by a "nonrelative not named in a will as guardian shall contain ... an allegation as to whether or not the petitioner's home is licensed as a foster family home." (9) Guardianship grants legal rights, such as the right to custody, and imposes duties, such as the duty to support and educate the child. (Prob. Code, §§ 1500, 1512.) (10) A guardian can be removed on the grounds specified in Probate Code section 1580. Custody of the child can also be removed from the guardian under Welfare and Institutions Code section 300, and the jurisdiction of the juvenile court supersedes that of the probate court. (In re Carr (1944) 65 Cal. App.2d 681, 685 [151 P.2d 164].) In In re B.G., supra, 11 Cal.3d 679, 693, the court referred to this dual role: "[D]e facto parents, such as the foster parents in this case, should be permitted to appear as parties in juvenile court proceedings. Their standing should not depend upon the filing of a petition for guardianship, although the filing of such petition may aid in attesting to their interest in the custody of the child; ..."
(7c) We conclude that the trial court properly found that Lynna had been in foster care since May 26, 1971, and impliedly found that she had been supervised by a specified agency.
(4b) Appellant next argues that the evidence is insufficient to support the court's finding that placement of Lynna with her natural mother would be detrimental to the child.
*697 Dr. Richard Martin, a child psychiatrist who saw and tested Lynna about five times in the year and a half before the hearing, testified that separation of Lynna from the respondents would lead to grief and withdrawal of love and trust and would interfere with her capacity to form relationships in the future. Dr. Martin detailed his indirect testing methods such as "Draw a Person," "Make Up a Story," etc., in which there was ample opportunity for the child to include meaningful persons; Lynna never mentioned her biological mother or father and clearly considered the respondents her parents. He pointed out that Lynna had been with respondents continuously for 74 of her 79 months and had developed a wanted child-psychological parent relationship[3] with them. He had never seen the severance of such a relationship without detriment to the child. As examples of detriment, he cited the incidence of school problems, bed wetting, sleep disturbance, and juvenile delinquency in children whose ties had been severed. He had seen a great number of children who look back with melancholy, grief and depression over what happened to them earlier. When asked about Lynna's best interests, he replied: "Lynna is prospering. She had deep attachments to her psychological parents. The least harmful alternatives [sic] would be to leave well enough alone."
Appellant seeks to annul Dr. Martin's testimony by pointing out that he had advanced similar considerations about Dawn on the final review of her dependency proceedings. Dr. Martin indicated that he had not resisted Dawn's return as vigorously because "her attachments had been broken for a long period of time. She had suffered many untoward things *698 prior to that and had a deeper symbolic tie to the biological mother.... Dawn was truly in limbo." Unlike Lynna, Dawn had been with her mother for her first two and a half years. Appellant's objections go to the weight and credibility of Dr. Martin's testimony, which were for the trial court to determine.
The report of the Mendocino County Probation Department recommended that the petition freeing Lynna be granted. Jean Sullivan, Dorothea Proctor, and each of the respondents testified about Lynna's relationship with the respondents, her adjustment in their home and her relationship with appellant.
The court had substantial evidence on which to base its findings that it would be detrimental to Lynna to sever her relationship with respondents and to return her to appellant. (See In re Marcos S., supra, 73 Cal. App.3d at p. 782; In re D.L.C. (1976) 54 Cal. App.3d 840, 849 [126 Cal. Rptr. 863].)
Because the concepts and the evidence overlap, we will treat as one the compound third requirement in Civil Code section 232, subdivision (a)(7), "that the parent or parents have failed during such period [two years preceding the filing of the petition], and are likely to fail in the future, to [¶] (i) Provide a home for said child; [¶] (ii) Provide care and control for the child; [¶] (iii) Maintain an adequate parental relationship with the child; and [¶] (iv) Maintain continuous contact with the child, unless unable to do so." (11a) Appellant insists that a finding on each of the four conditions must be supported by clear and convincing evidence on that condition and that the evidence is insufficient to support the findings.
In specifying certain attributes of the parent-child relationship that the court must consider, the Legislature has indicated the seriousness of an irrevocable order depriving a parent of the custody and control of a child. (12) The onditions for a freeing order are more onerous than the one condition of "detriment to the child" required by Civil Code section 4600 when a modifiable order for custody to a nonparent is involved. The courts, too, have viewed the termination of the parent-child relationship "as a drastic remedy which should be resorted to only in extreme cases of neglect or abandonment." (See In re T.M.R. (1974) 41 Cal. App.3d 694, 703 [116 Cal. Rptr. 292]; In re Carmaleta B., supra, 21 Cal.3d 482, 489.)
(13) The legislative intent is equally clear that "`The purpose of the statute is to protect children.... The interest sought to be protected is *699 that of the welfare of the child. Its need to be raised with love, emotional security and physical safety is paramount to any right of a neglectful parent to have the custody and physical proximity of its child....'" (In re D.L.C., supra, 54 Cal. App.3d 840, 851; see also In re Eugene W. (1972) 29 Cal. App.3d 623, 629 [105 Cal. Rptr. 736].) The Legislature has mandated that provisions for freeing a child "shall be liberally construed to serve and protect the interests and welfare of the child." (Civ. Code, § 232.5.)
(14) Appellant did not request special findings in the trial court. She now requests the reviewing court to segregate and classify the evidence on which the trial court made its findings in the statutory language on each of the four conditions. It is not our province to do so. We do not think that the Legislature intended a strict and rigid adherence to the formula set forth in Civil Code section 232, subdivision (a)(7). (Cf. In re Zimmerman (1962) 206 Cal. App.2d 835, 844 [24 Cal. Rptr. 329]: "`... "Because human relationships and human conduct are so variable and complex it probably is impossible, and certainly undesirable, to state or to try to state a fixed formula applicable to all cases."'") In reviewing the evidence that supports the court's finding on the third requirement, we will look to the overall quality of the relationship between appellant and Lynna.
(11b) Ronald S. Nesset, deputy probation officer from Sonoma County, submitted a report on the mother's circumstances and concluded that he could "discern no relevant reason why [appellant] could not perform in an adequate parental role to young Lynna...." Elaine Jersild, a public health nurse for Sonoma County, submitted a letter on appellant's behalf. Both she and Audrey Gunther, a psychiatric social worker with the Sonoma County Mental Health Services, testified in favor of Lynna's return to appellant. They confirm that appellant has made commendable progress in overcoming earlier emotional inadequacies and that Gloradon and Jim are apparently providing a stable home for the other four children. Nesset, Jersild and Gunther did not personally interview Lynna or observe the interaction between appellant and Lynna.
(15) Appellant is now able to provide a "house" for Lynna, but it would be paradoxical to require the child's return for this reason in spite of the finding that it would be detrimental to her. In using the word "home," the Legislature intended a broader meaning: A place where one lives with his or her family, a place where one feels secure with its familiar conditions, circumstances and associations. The record does not reflect that Lynna has been in appellant's present house; Dr. Martin's *700 tests reveal that Lynna has put down deep roots with respondents and that she considers them her family. Both Jersild and Gunther acknowledge that a "readjustment" period would be necessary if Lynna were returned to appellant. (11c) All this was for the trial court to weigh and consider along with the evidence relating to appellant's relationship with Lynna.
Appellant visited Lynna regularly only during the period that Eric and Dawn were with respondents. For two and a half years prior to that period her contacts had been minimal, even during the time that Lynna underwent heart surgery. After Eric's return to appellant in June 1975, Lynna would not accompany her mother away from respondents' residence. Appellant offered no evidence to show that she had made any efforts to overcome the child's reluctance or to gain the child's confidence. From January 1976 when Dawn was returned to appellant until the time of the hearing in July 1977, appellant had visited Lynna twice, both visits being in December 1976.
There is no evidence that appellant ever sent Lynna a letter or a postcard to assure her of appellant's affection and concern. Except for the presumption of gifts at the December 1976 birthday party and Christmas celebrations, the record is devoid of any mention of gifts from appellant to Lynna. Appellant did make one $25 payment through the district attorney's office in April 1975. Appellant protests that it would "have indicated a gross mismanagement of her limited resources, resulting in deprivation to the children residing with her" to have sent clothing and gifts to Lynna. From the child's point of view, appellant's failure to provide such contacts might very well be interpreted as a lack of concern.
(16) As stated in In re Norma M., supra, 77 Cal. App.3d 110, 116: "The statute requires a finding that the parents have failed and are likely to fail in the future to provide such a home and family relationship. Of course, no one can predict the future with absolute certainty. The trial judge is called upon, in these cases, to simply determine the likelihood of whether the parent will in the future make a marked change in his or her behavior pattern in relation to the child. Unquestionably the parents' `track record' prior to the hearing is the best indication of such a likelihood." (Italics in original.) As reflected in the record below, appellant's inability to evoke in Lynna any of the "natural" child-to-mother responses is indicative of the flaw in their relationship. Although appellant is Lynna's biological mother, she is a stranger to Lynna. The trial court could properly conclude that there was little likelihood that the relationship would be reestablished.
*701 Both parties discuss the case of In re D.L.C., supra, 54 Cal. App.3d 840, in which this court affirmed the judgment freeing the minor from parental custody and control under Civil Code section 232, subdivisions (a)(2) and (7). Except for the reasons for the initial placement, the facts are similar. In that case, as in this, the mother had "demonstrated encouraging success in her own rehabilitation" (id., p. 847); two other children who had been removed from her custody had been regained at the time of trial, and they were "reasonably happy and well adjusted in their present home environment." (Ibid.) In affirming, this court quoted from In re Morrow (1970) 9 Cal. App.3d 39, 57 [88 Cal. Rptr. 142] (overruled on other grounds in Hollister Convalescent Hosp., Inc. v. Rico (1975) 15 Cal.3d 660, 674 [125 Cal. Rptr. 757, 542 P.2d 1349]): "The weight to be given to the rehabilitation of appellant and her excuses for past conduct was for the trial court." We do not find that the differences in D.L.C. as pointed out by appellant are significant. Appellant relies on In re Zimmerman, supra, 206 Cal. App.2d 835, in which the denial of a petition to free the child was affirmed. There, too, we emphasized that the trial court has the opportunity to observe the demeanor of the witnesses and to weigh the evidence; the existence or nonexistence of conditions compelling an order freeing the child is a determination "properly exercisable within the broad discretion invested in the trial court." (Id., at p. 847.)
(17) Although the standard of proof for the trial court is clear and convincing evidence, the appellate court need only determine whether there was substantial evidence to support the trial court's findings. (11d) In the case before us, there is substantial evidence to support the court's findings that appellant has failed and is likely to fail to provide a home for the minor, to provide care and control for the minor, to maintain an adequate parental relationship with the minor, and to maintain continuous contact with the minor.

USE OF CHILD PROTECTIVE SERVICES FOR REUNITING FAMILY
(18) This court has recently reiterated the principle advanced by appellant "that before state action may be undertaken to involuntarily terminate the natural relationship of parent and child, less drastic alternatives, such as provision for child protection services, must first be explored." (See In re Heidi T. (1979) 87 Cal. App.3d 864, 874 [151 Cal. Rptr. 263].) The failure to consider or offer such services before instituting a section 232 proceeding, however, does not automatically deprive the court of jurisdiction to entertain or grant the petition. (See In re Susan M. (1975) 53 Cal. App.3d 300, 310-312 [125 Cal. Rptr. 707], in which the court fully explores the place of child protective services in *702 § 232 proceedings; In re Heidi T., supra.) The requirements applicable where a county welfare department initiates the proceeding are: (1) the department must consider the propriety of child protective services and offer them if appropriate to qualified parents; and (2) if the department fails such consideration, the court must consider the propriety of ordering the services and, if necessary, must delay the proceedings for such purpose. The court may consider mitigating circumstances for the department's failure to offer the services. The requirements are equally applicable where persons other than the county welfare department initiate the section 232 proceedings.
(19) Although appellant did not raise the issue in the court below, she urges on appeal that the trial court abused its discretion in failing to consider such services and that the efforts at reunification must be properly evaluated in the probation report prepared in accordance with Civil Code section 233.
Appellant did not request a finding on the issue, and no finding was made. There is, however, substantial evidence to support the implied findings that services were considered and offered and that further efforts at reunification would be unproductive. Jean Sullivan, the social worker with the child protective services, testified that services were offered to appellant, but that she was unable or unwilling, or both, to utilize them. The dependency proceedings for Eric and Dawn were not terminated until January 23, 1976, which gives some indication that efforts at reunification of Lynna with appellant until that time would have been fruitless. After that date, appellant's contacts with Lynna were meager and sporadic. Appellant did seek counseling to aid in securing the return of Eric and Dawn to her custody and to help them readjust. The record reflects a passivity, if not disinterest, on her part toward working for Lynna's return. The services are voluntary (In re Jeannie Q. (1973) 32 Cal. App.3d 288, 298-300 [107 Cal. Rptr. 646]), and should not be forced on an unwilling or disinterested parent. The trial court did not abuse its discretion in failing to order such services and in failing to postpone the proceedings to explore the possibility of Lynna's return to appellant.
Although not contending that the probation report with its attachments was inadmissible, appellant argues that it was "inadequate" to support the court's judgment. Appellant's objection goes to the weight of the evidence which is in the province of the trial court. (In re Heidi T., supra, 87 Cal. App.3d at p. 875.) There was substantial evidence apart from the report to support the court's findings and implied finding on services.

*703 PRIVILEGED COMMUNICATIONS
(20) Appellant contends that the trial court committed reversible error in allowing Dorothea Proctor, a social services practitioner for the County of Sonoma, to testify. Mrs. Proctor was the caseworker for Eric and Dawn in the Sonoma County Juvenile Court dependency proceedings during the period that the children were placed with respondents. The court sustained appellant's objection to testimony concerning Eric and Dawn, on the grounds that information obtained by Mrs. Proctor in the course of her supervision was not relevant and was privileged. Mrs. Proctor was allowed to testify about her discussions with appellant concerning Lynna and about her observations of Lynna during her supervision of Eric and Dawn. She observed that Lynna stayed very close to Mrs. H. on a visit in August 1974, yet spent most of her time with Mrs. Proctor on a visit to appellant's home in January 1975 when Lynna was visiting her mother. She further testified that appellant had asked for Mrs. Proctor's removal as the caseworker and that appellant was "difficult to get hold of."
Appellant claims that the evidence was not relevant and therefore inadmissible under Evidence Code section 350 and that it was confidential and privileged under Welfare and Institutions Code section 10850. These claims are without merit.
Mrs. Proctor, using her notes made at the time of the interviews, testified about the interpersonal relations between Lynna and her foster parents and between Lynna and her natural mother's family. Her observations reveal the quality of those relations and assist the trier of fact in determining the issues raised under Civil Code section 232. The evidence was relevant and was admissible under Evidence Code section 351, unless privileged. We can only speculate on what Mrs. Proctor's testimony about Eric and Dawn might have been, but the court had discretion to exclude the evidence under Evidence Code section 352. The error, if any, related to the exclusion of testimony about Eric and Dawn and was not prejudicial to appellant.
(21a) Appellant cited no authority for her claim of privilege during the trial. On appeal, she relies on Welfare and Institutions Code section 10850. No reversal may be granted for the erroneous admission of evidence unless: (1) a timely objection is made and so stated as to make clear the specific ground of the objection; and (2) the evidence should have been excluded on the ground stated and the error resulted in a miscarriage of justice. (Evid. Code, § 353; People v. Welch (1972) 8 Cal.3d 106, 114-115 [104 Cal. Rptr. 217, 501 P.2d 225].) Mrs. Proctor's *704 testimony corroborated that of respondents, Dr. Martin, and Jean Sullivan, and the admission of her testimony about Lynna did not result in a miscarriage of justice. Although appellant did not make clear the ground for her objection, some examination of "the privilege" relating to Mrs. Proctor's testimony is in order.
At the time of the hearing, Eric and Dawn were receiving benefits under the aid to families with dependent children program (AFDC), which is partly funded by the federal government. (See 42 U.S.C.A. § 601 et seq.) Welfare and Institutions Code section 10850 provides that "applications and records concerning any individual made or kept by any public officer or agency in connection with the administration of any provision of this code relating to any form of public social services for which grants-in-aid are received by this state from the United States government shall be confidential, and shall not be open to examination for any purpose not directly connected with the administration of such program...." The statutes relating to "Public Social Services" are contained in division 9 of the Welfare and Institutions Code, section 1000 et seq. The record below does not clearly indicate that Mrs. Proctor had supervised or was supervising the family under the AFDC program or that she was using notes or records prepared in connection with that program; she was supervising Eric and Dawn in their placement during the juvenile court dependency proceedings. Therefore, Welfare and Institutions Code section 10850 arguably is inapplicable.
(22) Generally, the privilege for official information ("information acquired in confidence by a public employee in the course of his [or her] duty," Evid. Code, § 1040, subd. (a)) must be claimed by the public entity who is the holder of the privilege. Evidence Code section 1040 "`represents the exclusive means by which a public entity may assert a claim of governmental privilege based on the necessity for secrecy.'" (Italics in original, Shepherd v. Superior Court (1976) 17 Cal.3d 107, 123 [130 Cal. Rptr. 257, 550 P.2d 161], involving a claim of privilege under Gov. Code, § 6254, subd. (f).) It follows that a private person asserting the claim of privilege for official information must do so pursuant to Evidence Code section 1040, unless another means is provided by statute. In determining whether the proffered evidence is privileged, a trial court is called upon to decide a number of preliminary facts: (1) was the information acquired in confidence; (2) is the privilege absolute, i.e., disclosure is forbidden by a federal or state statute (Evid. Code, § 1040, subd. (b)(1)), or conditional (§ 1040, subd. (b)(2)); (3) if the privilege is conditional, does the necessity for preserving the confidentiality outweigh *705 "the necessity for disclosure in the interest of justice" (§ 1040, subd. (b)(2)); and (4) in such cases as the one before us, can a private person assert the claim of privilege for official information. (See Evid. Code, § 405.) The trial court may conduct an in camera hearing when necessary to rule on a claim of privilege. (Evid. Code, § 915.)
(21b) Welfare and Institutions Code section 10850 refers to confidential "applications and records concerning any individual" relating to any form of public social service received. The testimony of Dorothea Proctor related to observations of Lynna, her difficulty in reaching appellant, and her differences with appellant. Such information was not "acquired in confidence."
(23) The legislative purpose in providing for confidentiality of public social service records is to protect the right of privacy of the recipient of such benefits. (Cf. Gov. Code, § 6254, "nothing in this chapter shall be construed to require disclosure of records that are: ... (c) Personnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy....") The privilege for confidential records under Welfare and Institutions Code section 10850 is a conditional one. The section itself provides for release of records for specified purposes. Certainly when the best interests of a minor child are at stake, the need for disclosure of relevant information "in the interest of justice" for the minor child outweighs the need for confidentiality. The records were held to be absolutely privileged in Sinacore v. Superior Court (1978) 81 Cal. App.3d 223, 225 [146 Cal. Rptr. 302], where a minor, in an action for the wrongful death of her mother, objected to an order granting defendants' motion for production of the county welfare department's records on the issue of damages. However, in In re Jeannie Q., supra, 32 Cal. App.3d 288, 305, the AFDC caseworker was allowed to testify in a dependency proceeding about the physical and emotional condition of the minor children. The court stated at page 305: "The physical welfare of the children is of prime interest to the state and to the DPSS [Department of Public Social Services] in its administration of the program. That program requires that the social worker responsible for a family see that the minors are in good physical and mental condition. Insofar as this case is concerned no privilege existed under section 10850." (Cf. Wyman v. James (1971) 400 U.S. 309 [27 L.Ed.2d 408, 91 S.Ct. 381], holding that an AFDC caseworker's home visit is not unreasonable because the public's interest is protection and aid for the child; the dependent child's needs are paramount and the mother's claim under the Fourth Amendment is secondary.)
*706 For the reasons stated, the claim of privilege was properly denied. Therefore the admission of Dorothea Proctor's testimony was not error.
The judgment freeing the minor child from the custody and control of her natural parents is affirmed.
Racanelli, P.J., and Newsom, J., concurred.
A petition for a rehearing was denied May 24, 1979, and appellant's petition for a hearing by the Supreme Court was denied July 19, 1979.
NOTES
[*] Assigned by the Chairperson of the Judicial Council.
[1] This statute, in effect from January 1, 1977, through July 1, 1978, read in pertinent part: "(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his [or her] parents when such person comes within any of the following descriptions: ... (7) Who has been cared for in one or more foster homes under the supervision of the juvenile court, the county welfare department or other public or private licensed child-placing agency for two or more consecutive years, providing that the court finds by clear and convincing evidence that return of the child to his [or her] parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future to [¶] (i) Provide a home for said child; [¶] (ii) Provide care and control for the child; [¶] (iii) Maintain an adequate parental relationship with the child; and [¶] (iv) Maintain continuous contact with the child, unless unable to do so. [¶] Physical custody of the child by the parent or parents for insubstantial periods of time during the required two-year period will not serve to interrupt the running of such period."
[2] Civil Code section 232, subdivision (a)(7) was amended in 1976 to substitute "by clear and convincing evidence" for "beyond a reasonable doubt." It was amended again in 1977, to become operative July 1, 1978, to change the burden of proof back to "beyond a reasonable doubt." However, an urgency measure was enacted in 1978 again amending the statute, operative July 1, 1978, to provide for the "clear and convincing evidence" standard. (Stats. 1978, ch. 429, § 23; ch. 1269, §§ 1-3.)
[3] Dr. Martin indicated that the concept of the "wanted child-psychological parent relationship" was first advanced in the book, Beyond the Best Interests of the Child (1973) by Goldstein et al., which is also cited in In re Carmaleta B., supra, 21 Cal.3d 482, 489. The authors compare the biological and psychological parents: "Normally, the physical facts of having begotten a child or given birth to it have far-reaching psychological meaning for the parents as confirmation of their respective sexual identities, their potency and intactness. Derived from this is the inclusion of the newborn and infant in the parents' self-love. The overflow of this self-love to the child leads to the common parental overvaluation of their offspring. Biological parents are credited with an invariable, instinctively based positive tie to the child, although this is frequently belied by evidence to the contrary, in cases of infanticide, infant-battering, child neglect, abuse, and abandonment. [¶] The biological parent's relationship to the child is seriously interfered with in instances where the adults in question reject their own male or female identity. When the newborn is defective, his very existence may become a reason for shame and guilt instead of pride, and for the father a discredit to his potency. [¶] By contrast, for the child, the physical realities of his conception and birth are not the direct cause of his emotional attachment. This attachment results from day-to-day attention to his needs for physical care, nourishment, comfort, affection, and stimulation. Only a parent who provides for these needs will build a psychological relationship to the child on the basis of the biological one and will become his `psychological parent' in whose care the child can feel valued and `wanted.' An absent biological parent will remain, or tend to become a stranger." (Id., at p. 17.)