[Civ. No. 23735. Third Dist. Mar. 27, 1986.]

In re SHANNON C., a Minor.
DEPARTMENT OF SOCIAL WELFARE, Plaintiff and Respondent, v.
RAYMOND C., JR., Objector and Appellant;
PATRICIA ANN SUTTON, Intervener and Respondent.

## COUNSEL

Timothy F. Cahill, under appointment by the Court of Appeal, for Objector and Appellant.

L. B. Elam, County Counsel, and Clement J. Dougherty, Jr., Deputy County Counsel, for Plaintiff and Respondent.

Gerald L. Kossow for Intervener and Respondent.

Joseph Russell, under appointment by the Court of Appeal, for Minor.

## OPINION

**SIMS, J.**—In this case we hold that Evidence Code section 1530 does not authorize the admission in evidence of a copy of a writing in the custody of a public entity to prove the truth of the matter stated in the writing.

Raymond C., Jr., the father of Shannon C. and on active duty with the U.S. Navy, appeals from the trial court's judgment[1] declaring Shannon free from Raymond's custody and control and appointing a guardian for her

---

[1]The judgment also terminated the parental rights of Shannon's mother, Terry C., though pursuant to Civil Code section 232, subdivision (a)(6) [parent is mentally disabled]. Terry C. is not a party to this appeal.

pursuant to Civil Code section 232, subdivision (a)(7).[2] Raymond contends, inter alia, the trial court committed reversible error when it admitted in evidence United States Naval records allegedly documenting the whereabouts of his ship during times crucial to his reunification with Shannon. Because we agree with this contention, we reverse the judgment on this ground and do not address Raymond's remaining contentions.

## FACTS

Shannon has been diagnosed as having aphasia, a speech and learning disability, and may be mildly retarded. She is also an emotionally damaged child.

Shannon was three and one-half years old when she was taken into protective custody by the Sacramento County Sheriff's Department on December 21, 1978. She was found suffering from a variety of physical ailments and was living with her mother in conditions which can only be described as squalid. Raymond was on active duty in the Navy at this time and not living at home.

Pursuant to Welfare and Institutions Code section 300, Shannon was made a dependent of the Sacramento County Juvenile Court on January 19, 1979.

---

[2]At the time of trial, Civil Code section 232 provided in pertinent part: "(a) An action may be brought for the purpose of having any child under the age of 18 years declared free from the custody and control of either or both of his parents when the child comes within any of the following descriptions:

" . . . . . . . . . . . . . . .

"(7) Who has been cared for in one or more foster homes, residential facilities licensed pursuant to Chapter 3 (commencing with Section 1500) of Division 2 of the Health and Safety Code, or health facilities licensed pursuant to Chapter 2 (commencing with Section 1250) of Division 2 of the Health and Safety Code, under the supervision of the juvenile court, the county welfare department or other public or private licensed child-placing agency for 12 months, provided the court finds by clear and convincing evidence that return of the child to the child's parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future, to do all of the following:

"(i) Provide a home for the child.

"(ii) Provide care and control for the child.

"(iii) Maintain an adequate parental relationship with the child.

"The court shall make a determination that reasonable services have been provided or offered to the parents or guardians which were designed to aid the parents or guardians to overcome the problems which led to the deprivation or continued loss of custody and that despite the availability of these services, return of the child to the parents or guardians would be detrimental to the child. Probation officers or social workers who provided these services shall appear at the termination proceedings.

" . . . . . . . . . . . . . . .

"(b) At all termination proceedings, the court shall consider the wishes of the child and shall act in the best interests of the child." (Stats. 1982, ch. 978, § 1, pp. 3525-3527.)

A plan of family reunification was then drawn up by a social worker from the county welfare department, Shannon's mother, and a therapist. Raymond did not participate in designing the plan but signed it on April 6, 1979. A projected date of reunification of June 30, 1979, was made.

The plan itemized Raymond's responsibilities in reunification as follows: "Become involved with visitation and programs to meet Shannon's needs whenever possible. (It is understood that Mr. [C.] will be on ship and not available the majority of the time)."

On July 11, 1979, Shannon was placed in the foster home of intervenor Patricia Ann Sutton, who had prior experience caring for an aphasic child. At the time of trial, Mrs. Sutton and Shannon lived in Texas.

In December 1979, it became apparent that Shannon's mother had abandoned efforts at reunification and the social worker told Raymond it was necessary for him to make a plan if he wanted to be with his daughter. Raymond indicated he was interested in Shannon's welfare and said he would try to get shore duty to be more actively involved with her.

Raymond maintained contact periodically with the social worker from October 1980 until August 1981 when he finally reported for shore duty at Boardman, Oregon, but he did not visit Shannon during this time. Raymond obtained housing in Boardman for his new wife, himself and Shannon but was unable to have Shannon released to his custody.

By interstate compact, Delores Humphrey, a member of the Children's Services Division of the State of Oregon, conducted a home study of Raymond's home and concluded he and his wife would make excellent parents and Shannon should be placed with them. Humphrey indicated an active case was open in Oregon in anticipation of Shannon's arrival and that she, Humphrey, would work with Raymond, his wife and Shannon to help meet their needs. Other services had been arranged also.

Near the end of trial, a crucial issue of credibility had arisen from conflicting evidence with respect to Raymond's whereabouts from April to July of 1979, and his availability to fulfill the terms of the reunification plan by visiting with Shannon whenever possible.[3] Raymond had testified he could

---

[3]The trial court expressed the issue as follows: "I take it it's the consensus of all counsel that all witnesses and all testimony wanted are before the Court, with the possible exception of whatever additional evidence might be appropriate on the general subject of credibility, in view of the way that things developed in the last two hearings of 180 degree split on some chronology on where people were and so forth, and I'm referring in no small part, if not completely, to who was present in Alameda and the Navy Lodge and the motel in '79, particularly."

not have been more involved with Shannon because he had been at sea much of the time.

The issue of credibility was so important to the trial judge in his understandable desire to "get to the guts of this thing" that on his own motion the judge phoned the office of the Commander of the Naval Service Force at Oakland to find out how to obtain Naval records which would reflect the location of the U.S.S. *Carpenter,* the ship on which Raymond had been stationed from April to July of 1979.[4]

With information provided by the trial court, counsel for intervenor Patricia Sutton (the foster mother) obtained copies of what were purported to be the originals of employment plans or schedules of the U.S.S. *Carpenter* for the months of April through July 1979.[5] These were offered into evidence pursuant to Evidence Code section 1530. (Further statutory references are to the Evidence Code unless otherwise indicated.) Raymond's counsel made a lengthy objection to their introduction based on hearsay, lack of foundation, and lack of authentication of the records.[6]

Nevertheless, the trial court admitted the employment schedules pursuant to sections 1530, 1531 and 1532.

---

[4]The judge promptly reported his call to all counsel.

[5]The "employment schedules" themselves appear to be photocopies of microfilm of computer printouts and are not easily reproduced here. The accompanying attestation certificate (with notarial acknowledgement deleted) is as follows: "*ATTESTATION CERTIFICATE* [¶] COMES Now the undersigned, and upon being duly sworn states the following: [¶] 'I am the Assistant Chief of Staff for Plans and Operations for Commander Naval Surface Force, U.S. Pacific Fleet, San Diego, California.' [¶] 'My responsibilities include maintaining records of planned employment schedules for Naval Surface Force, U.S. Pacific Fleet ships.' [¶] 'I hereby certify that the attached copies consisting of four pages are true and correct copies of the original plans maintained by Commander Naval Surface Force, U.S. Pacific Fleet pertaining to USS CARPENTER (DD 825) for the period of 1 April 1979 through 31 July 1979.'"

[6]The objection is as follows: "MR. BRITTON [Raymond's counsel]: I'm objecting on the grounds that there's no authentication, no evidence, no authentication being laid as to the genuineness of these documents, how they were prepared, what they in fact reflect. I'm going to object on the grounds that the documents are hearsay statements, even getting around 1530, I think there's got to be some sort of evidence entered or introduced as to the authentication of these documents, who prepared them, how were they prepared and what in fact they reflect, and I would certainly suggest that in light of the fact that the copies are so—or what I would feel to be terrible copies, and number two, we're really talking about some crucial evidence here. [¶] It goes to the credibility of the witnesses, and your Honor has talked about credibility before in this case, and I just don't think that these documents ought to be permitted by a very brief attestation certification. . . . . [¶] It's too easy to simply certify that these are copies of records that are in my possession, but since we're really talking about the truth of the matter that's being stated in these records, I think we need more of a declaration as to what these records show, how were they prepared, what do they reflect, when were they made, how were they made."

In its statement of decision the trial court found "incredible" Raymond's testimony that he had made numerous efforts to have Shannon placed with him, to contact the social worker, or to visit with Shannon. The court found by clear and convincing evidence that Shannon had established a loving bond with her foster family, that it would be detrimental to Shannon to remove her from the care and custody of the foster home, and that it was in Shannon's best interest to remain in the foster home.

DISCUSSION

I

A. *The Naval Records Were Erroneously Admitted in Evidence*

 The trial court erroneously relied on section 1530[7] to admit the Navy records.

Section 1530 is found in chapter 2 of division 11 of the Evidence Code concerned with "Secondary Evidence of Writings." Section 1530

---

[7]Section 1530 provides: "(a) A purported copy of a writing in the custody of a public entity, or of an entry in such a writing, is prima facie evidence of the existence and content of such writing or entry if:

"(1) The copy purports to be published by the authority of the nation or state, or public entity therein in which the writing is kept;

"(2) The office in which the writing is kept is within the United States or within the Panama Canal Zone, the Trust Territory of the Pacific Islands, or the Ryukyu Islands, and the copy is attested or certified as a correct copy of the writing or entry by a public employee, or a deputy of a public employee, having the legal custody of the writing; or

"(3) The office in which the writing is kept is not within the United States or any other place described in paragraph (2) and the copy is attested as a correct copy of the writing or entry by a person having authority to make attestation. The attestation must be accompanied by a final statement certifying the genuineness of the signature and the official position of (i) the person who attested the copy as a correct copy or (ii) any foreign official who has certified either the genuineness of the signature and official position of the person attesting the copy or the genuineness of the signature and official position of another foreign official who has executed a similar certificate in a chain of such certificates beginning with a certificate of the genuineness of the signature and official position of the person attesting the copy. Except as provided in the next sentence, the final statement may be made only by a secretary of an embassy or legation, consul general, consul, vice consul, or consular agent of the United States, or a diplomatic or consular official of the foreign country assigned or accredited to the United States. Prior to January 1, 1971, the final statement may also be made by a secretary of an embassy or legation, consul general, consul, vice consul, consular agent, or other officer in the foreign service of the United States stationed in the nation in which the writing is kept, authenticiated by the seal of his office. If reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of the documents, the court may, for good cause shown, (i) admit an attested copy without the final statement or (ii) permit the writing or entry in foreign custody to be evidenced by an attested summary with or without a final statement.

"(b) The presumptions established by this section are presumptions affecting the burden of producing evidence."

codifies an exception (for public records) to the best evidence rule, which ordinarily requires that an original writing be admitted to prove the content of a writing (§ 1500).

"Section 1530 of the Evidence Code is concerned with the use of a copy of a writing in official custody to prove the content of the original." (Law Revision Com. com. to § 1530, 1970 amendment.) Section 1530 does not allow either the original or the copy of the writing to be used to prove the truth of the matter asserted in the content of the writing. ■ "It is to be noted that Evid C §§ 1530 and 1452-1453 provide the means of authenticating the existence and content of an original writing in the custody of a public entity and of authenticating the copy proffered in evidence as a true copy of the original. *The admissibility of the original writing in possession of the public entity must be based on some exception to the hearsay rule such as the admission of a party (Evid C § 1220) or the exception for entries in official or public records (Evid C § 1280).*" (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 5.1, p. 250, italics added.)

■ The trial court also relied on sections 1531 and 1532. Section 1531[8] sets out what must be stated in an attestation or certificate which accompanies the copy of an original writing. If its conditions are satisfied, the statute merely permits a copy of a writing to be used in place of an original. Section 1532[9] establishes, on satisfaction of its prerequisites, a presumption affecting the burden of producing evidence on the issue of the existence and content of an original recorded writing. ■ At most, section 1532 permits the contents of a recorded writing to be proved by the official record of the writing; the statute does not allow the contents to be admitted in evidence for the truth of the matter stated. (See McDonough, *The California Evidence Code: A Precis* (1966) 18 Hastings L.J. 89, 114-115.) Thus, neither of these sections allows a copy of a writing to be admitted in evidence for the truth of the matter contained in the writing.

■ As Raymond's counsel correctly observed in his objection (see fn. 6, *ante*), intervener should have produced evidence satisfying the foundational requirements set forth in section 1280, which provides as follows: "Evidence of a writing made as a record of an act, condition, or event is

---

[8]Section 1531 provides: "For the purpose of evidence, whenever a copy of a writing is attested or certified, the attestation or certificate must state in substance that the copy is a correct copy of the original, or of a specified part thereof, as the case may be."

[9]Section 1532 provides: "(a) The official record of a writing is prima facie evidence of the existence and content of the original recorded writing if:
"(1) The record is in fact a record of an office of a public entity; and
"(2) A statute authorized such a writing to be recorded in that office.
"(b) The presumption established by this section is a presumption affecting the burden of producing evidence."

not made inadmissible by the hearsay rule when offered to prove the act, condition or event if: [¶] (a) The writing was made by and within the scope of duty of a public employee; [¶] (b) The writing was made at or near the time of the act, condition, or event; and [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (See *Fisk* v. *Department of Motor Vehicles* (1981) 127 Cal.App.3d 72, 77 [179 Cal.Rptr. 379, 31 A.L.R.4th 905].)

The trial court had before it no evidence tending to satisfy the foundational requirements of section 1280. ■ It is true that live testimony is not always required to establish the foundational requirements of section 1280. (See 1 Jefferson, *op. cit. supra,* § 5.1, pp. 245-248.) Where the writing itself, or its certificate of authentication, contains the foundational facts required by section 1280, and these are not reasonably subject to dispute, a trial court may take judicial notice of the required facts pursuant to section 452, subdivision (h). (*Ibid.; People* v. *Flaxman* (1977) 74 Cal.App.3d Supp. 16, 20-22 [141 Cal.Rptr. 799].) An appellate court may do the same. (*People* v. *Abelson* (1980) 104 Cal.App.3d Supp. 16, 20 [164 Cal.Rptr. 369].)

■ The device of judicial notice cannot be used here because neither the Naval records nor their accompanying certificate of attestation contain any information required by section 1280. (See fn. 5, *ante.*) The records do not show who prepared them, when they were prepared, or the method of preparation. Indeed, although the records were admitted for the purpose of showing the whereabouts of the U.S.S. *Carpenter* between April and July 1979, the records are described on their face as "employment schedules" and by the certificate of authenticity as "planned employment schedules." If language is given its ordinary meaning, the documents are schedules showing where the ship was supposed to go, not where it actually went. In these circumstances, we cannot use the device of judicial notice to supply evidence required by section 1280.

■ ■ fn. ■ ■ The trial court erroneously admitted the records in evidence over Raymond's hearsay objection.[10]

---

[10]The Law Revision Commission comment to section 1280 states in part: "The evidence that is admissible under this section is also admissible under Section 1271, the business records exception. However, Section 1271 requires a witness to testify as to the identity of the record and its mode of preparation in every instance. In contrast, Section 1280, as does existing law, permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness. . . ." Clearly, the records were not admissible under section 1271 since a witness did not testify as to their identity and mode of preparation. (See § 1271, subd. (c).)

### B. *The Error Was Prejudicial*

■ We cannot conclude the evidentiary error was harmless.

To be sure, the trial court's statement of decision makes plain that the trial court found it was in Shannon's best interest to remain with her foster mother. However, the best interest of the child was not the *sole* criterion by which parental rights could be irrevocably terminated.

■ Civil Code section 232 addresses "a complex group of interrelated, but perhaps conflicting, interests among which are those of (1) the parent and child in a continuing familial relationship; (2) the parent in preserving the integrity and privacy of the family unit, free of state intervention and social stigma attached to either parent or child; (3) the child in a permanent, secure, stable, and loving environment; and (4) the state in protecting the child." (*In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198].) ■ "The termination of parental rights contemplated by [Civil Code] section 232 is the ultimate sanction envisioned by the Legislature. It represents the total and irrevocable severance of the bond between parent and child. ([Civ. Code,] §§ 232.6, 238.) The child's emotional relationships with his or her natural parent and siblings are cut off. Any right to parental support or to an inheritance from biological family members is terminated. The parents, in turn, lose the right to the companionship, care, and custody—and the possibility of ever regaining visitation rights or custody—of their offspring. [¶] The 'fundamental interests' which are at stake are 'ranked among the most basic of civil rights . . . .' (*In re Carmaleta B.* [1978] 21 Cal.3d [482,] 492 [146 Cal.Rptr. 623, 579 P.2d 579]; *In re B.G.* [1974] 11 Cal.3d [679,] 688 [114 Cal.Rptr. 444, 523 P.2d 244].) Consequently, the parent-child relationship may be terminated under section 232 'only in extreme cases of persons acting in a fashion incompatible with parenthood.' (*In re Carmaleta B., supra,* 21 Cal.3d at p. 489.) [¶] Other provisions of statutory law permit a child to be taken from the custody of a deficient parent without extinguishing the parent-child relationship or terminating all parental rights. (See especially Welf. & Inst. Code, § 300.)" (*In re Elise K.* (1982) 33 Cal.3d 138, 146 [187 Cal.Rptr. 483, 654 P.2d 253] (conc. opn. of Bird, C. J.).)

■ Thus, before parental rights could be severed, subdivision (a)(7) of Civil Code section 232 required the court to find, inter alia, that the parent had failed during the period of foster home care, and was likely to fail in the future, "to do *all* of the following: [¶] (i) Provide a home for the child. [¶] (ii) Provide care and control for the child. [¶] (iii) Maintain an adequate parental relationship with the child." (Italics added; see fn. 2, *ante;* see also *In re Laura F.* (1983) 33 Cal.3d 826, 831-832 [191 Cal.Rptr. 464, 662

P.2d 922].) The Naval records were essential to the trial court's findings, adverse to Raymond, on these crucial issues.

As we have noted, the trial court itself initiated a request for the records. At the conclusion of the trial, the court remarked: "All right. Just thinking, and I'm just speculating here, and it could excuse Mr. [C.'s] inaccuracies to this Court if he thought he's got to protect his flank against a paternity action up in Yuba County or something, because if they find out he was around in the spring of '79, and this child—summer of '79, child born in the spring of '80, that's not going to look good for him on his paternity case, he could have talked himself into believing he really wasn't around in the spring and summer of 1979. But I don't think the U.S. Navy generated all these documents to put him behind the eight ball, and I think the U.S.S. Carpenter was in and out of San Francisco Bay all that summer, so his credibility is sort of shot to [heck], which doesn't make him an evil man, but sure underscores what Joe Russell [counsel for Shannon] was pointing out, the fellow's not too—what was the term? [¶] MR. RUSSELL: Resourceful. [¶] THE COURT: Resourceful."

The trial court's statement of decision concludes that Raymond's testimony concerning his efforts to comply with the reunification plan was "incredible" and "marred by overwhelming proof that he was untruthful."

The record clearly shows the case turned largely on the question of Raymond's credibility, which in turn depended on whether his testimony was corroborated by the Naval records. In light of the evidence of Oregon authorities showing Raymond and his wife were well qualified to care for Shannon, we cannot say the erroneous introduction of the records was harmless. Where the improper introduction of evidence results in a miscarriage of justice, reversal is required. (*In re Lynna B.* (1979) 92 Cal.App.3d 682, 704 [155 Cal.Rptr. 256]; Cal. Const., art. VI, § 13.) We believe it is reasonably probable a more favorable result would have occurred absent the erroneous admission of the records. (*People* v. *Watson* (1956) 46 Cal.2d 818, 834 [299 P.2d 243].)

### DISPOSITION

The judgment is reversed.

Puglia, P. J., and Carr, J., concurred.