[Civ. No. 39825. Second Dist., Div. Five. Feb. 28, 1973.]

Guardianship of DONALD JAMES MARINO, a Minor.
VERA F. MILLER et al., Plaintiffs and Respondents, v.
NICHOLAS MARINO, Defendant and Appellant.

COUNSEL

William L. Baker for Defendant and Appellant.

Solton & Jacobs and Donald R. Jacobs for Plaintiffs and Respondents.

OPINION

ASHBY, J.—This is an appeal from a judgment for the guardianship of the person of Donald James Marino (a minor under the age of 14) by and issuance of letters of guardianship to the minor's maternal aunt and her husband.

Donald James Marino was born December 5, 1962. At the time of the order appealed from, he was 8 years and 9 months of age. He was just entering the third grade in elementary school. His parents were the appellant, Nicholas Marino, and Shirley Mae Marino. Donald was the last of eight children born to his parents. His mother Shirley Mae Marino died only two weeks after he was born. Upon the death of Shirley Mae Marino, her sister, respondent Vera Miller, agreed to take the infant Donald and care for him until his father could care for him. Mrs. Miller and her husband took Donald into their home and raised him as if he were their own son. They came to love him as their own son and Donald knew them as the only parents he had. He grew up to call Mrs. Miller "mommie" and Mr. Miller "Tink." He was told about his natural parents by the Millers but still thought of the Millers as his mother and father.

Appellant saw little of the boy until he was 6 years old, at which time he started seeing more of his son and indicated his intention to take the boy. He registered him in a school in 1968 but was persuaded that this was premature and a more gradual transition was necessary to prepare the boy for a change of homes. He began to visit the boy more often and to take him home with him for short periods. In 1969 he again sought to take Donald out of the school he was attending and register him in a school near appellant's home. He was again persuaded that the time to move Donald was not right. In 1970 he registered Donald in a school near appellant's home and this time refused to accept any further delays and insisted that Donald come with him and his new wife (Marino remarried in August 1969) and the seven other Marino children. Donald did not wish to live with his father and in the face of his resistance and appellant's insistence

upon reclaiming care and control of Donald, respondents filed a petition for letters of guardianship.

After several continuances and postponements, the matter was heard and on January 8, 1971, the petition for appointment of guardian was denied. At the suggestion of the court, the parties worked out a transitional program under which Donald would continue to live with respondents but would spend alternate weekends with his father until Easter when he would live with his father and spend alternate weekends with respondents.

At approximately 2 o'clock in the afternoon of February 6, 1971, Donald called respondents to say that he had run away from his father's home and wanted to come home. He stated that the father had told him that he would never be able to go back to respondents and that he had purchased clothing for Donald to begin school in Huntington Park and he would be withdrawn from the school he was attending in Downey. Donald was crying hysterically and respondents picked him up and took him home. Donald was extremely nervous and tense for the remainder of that weekend and suffered substantial intestinal distress. On the weekend of March 6, 1971, Donald again ran away from his father's home. Respondents again picked him up. Both the South Gate Police Department and the Downey Police Department became involved in this incident. Donald explained that he was in fear of his father, he was again suffering intestinal upset and was nauseous and throwing up. When told by respondents that he would have to return to his father's home, Donald became hysterical and cried violently. He ran away again on the next alternate weekend.

On April 1, respondents filed a petition for reconsideration with supporting declarations and points and authorities which was set for hearing on April 16, 1971. Since the proceeding of January 8, 1971, Donald repeatedly pleaded for an opportunity to confer with the court. At the hearing on April 16 he did confer with the trial judge and at that time told him he wanted to live with the Millers. He also stated that he did not get along with his brothers and sisters and that on his visits his stepmother goes into her room and sews and the father just goes out and does not spend any time with him.

Dr. Markowitz interviewed appellant and his wife and respondents, as well as Donald. In his report Dr. Markowitz said: "My general impression was that Mr. Marino did not view Donny as a son. He was less involved with Donny than the Millers were. When questioned as to why he wanted Donny back he said, 'If you had an iron that belonged to you wouldn't you want it back.'" The doctor's report went on: "Rather than love for his son Mr. Marino presented himself as a man who was unjustly treated.

The boy was his son and he had every right to him. Not once in the interview did he appear to acknowledge the fact that his son, having lived all but the first two weeks of his life with the Millers, would have any difficulty leaving his home with the Millers." His report continued stating the following about his interview with Donald: In the interview Donald "appeared somewhat fearful and overly controlled. He knew why he was here [at the interview] and the entire hour was spent with the boy talking about how he did not want to leave the Millers. . . . The interview was filled with themes of separation. Donny appeared to be going through the acute stress of separation from the people he viewed as parents. This would explain his current symptomatology of vomiting and running away from the Marinos. Donny appeared to be an overly dependent boy."

Dr. Markowitz recommended that Donald remain with the Millers, respondents, and that he continue visiting his father to get to know him and his brothers and sisters better.[1]

Donald was also examined by Dr. Lester C. Lee, a psychologist, who stated that, "DONALD's emotional stability and development, especially with his neurological involvement, dictates a well stabilized environment as free of stress and tension and highly structured and well organized as possible. Unless this is provided, DONALD is likely to have very serious academic and social adjustment problems in the teen-age years." Dr. Lee recommended that between respondents' and appellant's homes it would be more appropriate for Donald to be returned to the home of respondents. He, however, indicated because of the stress and tension between the two families that placement in a foster home would be preferable. .

Between April 16, 1971, and September 3, 1971, the court made

---

[1]"I feel it would be extremely traumatic for this 8½ year old boy to be taken away from the Millers. He clearly views them as his parents. At this time in his life to be taken away from them might lead to psychological trauma that would affect the rest of his life adversely. Therefore, it is my feeling that he continue to live with the Millers. Although they are not his biological parents he certainly views them as his emotional parents. I think it should be made clear to Donny that he will stay with the Millers. At the same time I think it is important that he should get to know his father like a close uncle and his siblings like close cousins. I further recommend that the Millers receive help in permitting Donny to be less dependent upon them. He certainly should not be allowed to sleep in their bed with them. Perhaps if they have legal custody they could tolerate letting him go more. Donny, when he reaches adolescence, may seek out his natural father on his own. Developmentally, the adolescent seeks his true identity and will reject his parents and turn towards other figures in his environment. Mr. Marino might well be that figure if he handles Donny well at this time in his life."

several interim orders for Donald to spend alternate weekends with each family but to remain in the custody of the Millers. On September 3, 1971, the court granted respondents' petition for guardianship. The court stated its findings and reasons for granting the petition. Counsel stipulated, and the court agreed, that the reporter's transcript of the judge's remarks from the bench could be deemed to be the court's findings of fact and conclusions of law. The court then requested and received from all parties an agreement that Donald visit the home of appellant every other weekend commencing September 4, 1971. The order appointing guardian pursuant to Probate Code section 1440 was signed and filed by the court on September 13, 1971, and letters of guardianship were issued to respondents on September 21, 1971.

Appellant contends that since there was no finding of abandonment or unfitness on his part, the order awarding custody to respondents is in violation of Probate Code section 1407 and the judicial interpretation of that section contained in *Guardianship of Smith,* 42 Cal.2d 91 [265 P.2d 888, 37 A.L.R.2d 867]. Respondents contend that the enactment of Civil Code section 4600 operated to eliminate the finding of parental unfitness required theretofore by *Smith* to overcome the natural parent's preferential right to custody in all guardianship cases.

*Stewart* v. *Stewart,* 41 Cal.2d 447, 452 [260 P.2d 44], cites the statutory parental preference rule as follows: "Section 1407 of the Probate Code provides that as between persons equally entitled in other respects to the guardianship of a minor preference is to be given first to a parent. This section has been construed to be substantially the same as former section 246, subd. (3) of the Civil Code and section 1751 of the Code of Civil Procedure which provided, in substance, that a parent if competent is entitled to custody in preference to any other person." However, none of these code sections included the requirement of a finding of parental unfitness. Both Probate Code section 1406 and former Civil Code section 138 directed the court to consider what was in the best interests of the child. Judicial interpretation of these code sections established the rule set forth by a sharply divided court in *Guardianship of Smith, supra,* at page 92, that, "It is settled in this state that in either guardianship proceedings or custody proceedings in a divorce action, the parents of a legitimate child have preference over a nonparent and the custody shall not be given to a nonparent unless the parent is found unfit." No distinction has been made under the cases between the two codes under which the issue of child custody arose. (*Stewart* v. *Stewart, supra,* 41 Cal.2d 447, 451-452; *Guardianship of Smith, supra,* pp. 92-93.) The courts have been concerned with the substance of the issue and the proper placement of the child rather than

the form of the pleading and have applied the same rules irrespective of whether the action was commenced under the Probate Code or the Civil Code.

Against this background, Civil Code section 4600 was enacted as part of the Family Law Act.[2] In setting forth the new requirements for the court, the Legislature specifically omitted any requirement of a finding of unfitness.

We find that Civil Code section 4600 makes unnecessary a finding of parental unfitness in any proceeding where there is at issue the custody of a minor child. As the latest expression of legislative intent on this matter we find it to be controlling. We find no legally significant reason for using a different approach in the awarding of custody in a dissolution matter from the awarding of custody of a minor child in a nondissolution situation.

Section 4600 by its own terms applies in "any proceeding where there is at issue the custody of a minor child, . . ." There is no restriction in the language used by the Legislature to a situation involving a dissolution of a marriage. The Legislature is assumed to have known of the judicial interpretation of prior code sections and therefore intended to reverse those determinations.[3]

---

[2]"§ 4600. In any proceeding where there is at issue the custody of a minor child, the court may, during the pendency of the proceeding, or at any time thereafter, make such order for the custody of such child during his minority as may seem necessary or proper. If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court shall consider and give due weight to his wishes in making an award of custody or modification thereof. Custody should be awarded in the following order of preference:

"(a) To either parent according to the best interests of the child, but, other things being equal, custody should be given to the mother if the child is of tender years.

"(b) To the person or persons in whose home the child has been living in a wholesome and stable environment.

"(c) To any other person or persons deemed by the court to be suitable and able to provide adequate and proper care and guidance for the child.

"Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child. Allegations that parental custody would be detrimental to the child, other than a statement of that ultimate fact, shall not appear in the pleadings. The court may, in its discretion, exclude the public from the hearing on this issue."

[3]The Report of the Governor's Commission on the Family of which several legislators were members stated that: "[I]n the occasional case where the child's interests would be served best by giving custody to a non-parent—a stepparent or relative, for example—the court cannot presently achieve this without an affirmative finding that the parents are wholly unfit. This doctrine is designed to secure the rights of the parents, which is surely a fit goal. Unfortunately, it sometimes loses sight, we believe, of the right of the child to an award of custody which will promote the stability of his life and best permit him to grow up as a happy and productive member of society.

"We have no intention of undermining the parents' rights to the custody of their

As stated above, the cases have treated the custody issue the same regardless of the code sections involved and there is no logical reason or legal reason why the requirements for determining the custody of a child should depend on whether relief is sought under the Probate Code or the Civil Code. Therefore, we find that *Guardianship of Smith, supra,* 42 Cal.2d 91, is not controlling in the case at bench.

■ Appellant's next contention is that neither the evidence presented nor the findings of the trial court are sufficient to justify an award of guardianship to a nonparent under Civil Code section 4600. In regard to findings, Civil Code section 4600 sets forth two requirements. It provides that, "Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, *it shall make a finding that an award of custody to a parent would be detrimental to the child* and *the award to a nonparent is required to serve the best interests of the child.*" (Italics added.) The record shows that although the court did make a finding that the award of custody to respondents was in the best interests of the child, an express finding that an award of custody to the appellant would be detrimental to the child, was not made.[4] A review of the legislative history of Civil Code section 4600 shows that the Legislature intended that a specific finding be made on this point in support of an award of custody to a de facto guardian.[5]

children, and we believe that the primacy of those rights must be preserved. We are convinced, however, that no useful purpose can be served by forcing a formalized finding of unfitness. The cases in which the child's best interest would require a custodial award to a third person may be rare, but are nonetheless serious. To take the most common example, if the custodial parent dies and the Court should specifically find that the child's welfare would best be served by awarding custody to the stepparent, with whom the child has been living and with whom he has formed a warm and stable relationship, should not the Court be able to so order without having to find a long-absent or minimally-interested parent judicially unfit? We believe that it should."

[4]In making its finding, the court stated, ". . . I do not find him unfit, and I do not intend to make a finding that he is unfit. But I will find, and do, that it is in the best interests of Donald that the guardianship be granted, and that it will serve those best interests to the greatest possible extent by granting the guardianship to the nonparents, Millers."

[5]"However, before custody can be awarded to one other than a parent, the court must specifically find that an award of custody to a parent would be detrimental to the child, and that the award to a nonparent is required to serve the best interests of the child. What is 'detrimental' has not been set forth with particularity. It is a nearly impossible task to devise detailed standards which will leave the courts sufficient flexibility to make the proper judgment in all circumstances. For example, many would argue that an award of custody to a parent would obviously be detrimental to the child if such parent could not provide the necessities of life or a suitable place of abode. But unfortunately there are segments of our society where children are provided neither the necessities of life nor suitable living quarters. Nevertheless, either

The apparent error of the court in failing to make an express specific finding of detriment does not require a remand to the trial court for the purpose of making an appropriate finding. At the time the court orally stated its reasons for awarding custody to respondents, a formal request for findings of fact and conclusions of law was pending before the court. The court had no reason to believe at that time that its remarks would someday be scrutinized as the legal equivalent of written findings. Appellant, however, withdrew his request for written findings after the court announced its intended decision[6] and for that reason formal written findings of fact and conclusions of law were not made.[7]

Reading the court's remarks in their entirety, it is apparent that the court was mainly, if not exclusively, concerned with the question whether it had to make a finding of parental unfitness before granting respondents' petition. The court's remarks with respect to the findings required by section 4600 of the Civil Code were made by comparing them to the findings necessary under section 1407 of the Probate Code as interpreted in *Guardianship of Smith, supra,* 42 Cal.2d 91. When it spoke of the former section requiring a finding of "best interest," it was using that term synecdochically to stand for both findings required by the section.

The record contains no relevant evidence except what we have summarized in this opinion. Although the court did not have to accept that evidence, the fact that it found custody with respondents to be in the best interests of Donald conclusively proves that it did.[8]

---

parent might very well be the best possible custodian able to provide happiness and stability for the child. The court should not be governed only by economic factors in making a determination with respect to custody. The important point is that the intent of the Legislature is that the court consider parental custody to be highly preferable. Parental custody must be clearly detrimental to the child before custody can be awarded to a nonparent." 4 Assem.J. (1969 Reg. Sess.) p. 8061.

[6]"In light of the Court's remarks for the record just now, setting forth your reasons for your decision, and the findings that you have made that have led you to that decision, I hereby withdraw request for formal Findings of Fact and Conclusions of Law, because I feel that they would simply be redundant, and I am sure that in the event Mr. Marino decides to go further in this matter, the actual record—the Reporter's Transcript is going to be quite short anyway—so I believe that it is in the best interests of my client, and justice itself, to simply withdraw that request and let the record stand as it is now. . . ."

[7]We do not intimate that appellant was purposely preparing an appellate trap. Rather it appears that counsel was trying to spare his client the embarrassment of the express finding of detriment which, based on the court's remarks and the evidence, obviously was forthcoming.

[8]In fact, it also shows that the court did not accept the only evidence which indicated a different disposition: the suggestion by Dr. Lee that placement in a foster home would be the preferable solution.

Under the particular facts of this case and for the reasons set forth above, a finding that it would not be detrimental to Donald to live with his father would be self-stultifying. We hold this to be a proper case for the exercise of our power to "make findings of fact . . . in addition to those made by the trial court." (Code Civ. Proc., § 909.) Therefore, we find that it would be detrimental to Donald to be in the custody of his father.

The last contention of error cited by appellant is that the court considered extrajudicial evidence in favor of respondents without affording appellant an opportunity to present rebuttal evidence of the like nature. This contention has no merit. The trial court expressly stated that the extrajudicial evidence in the form of letters had been disregarded by the court and that the court's decision was based solely on testimony, reports and evidence submitted or consented to by counsel.[9]

It is therefore ordered that the "findings and conclusions" are hereby modified by an additional finding that at the present time custody with Nicholas Marino, Donald James Marino's natural father, would be detrimental to Donald.

The order is affirmed.

Kaus, P. J., and Cole, J.,* concurred.

On March 16, 1973, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied April 25, 1973.

---

[9]"THE COURT: I know I have a yellow copy someplace, and I will include it so that everything connected with this matter is in the file. But the letters by themselves, which are certainly extrajudicial, and not subject to cross-examination, and all that, the usual objections to hearsay matters, have been disregarded by me entirely.

"The Court has made this decision predicated in toto on the reports which counsel have given to the Court in chambers concerning the conduct of the parties, how the child has gotten along in the respective homes, Dr. Markowitz, the psychiatrist's report, and Dr. Lee, the psychologist's report. The letters had nothing to do with it. But I think they ought to be included in the file, and I will order them filed."

*Assigned by the Chairman of the Judicial Council.