[Civ. No. 53419. First Dist., Div. One. Jan. 25, 1983.]

Guardianship of PHILLIP B., a Minor.
HERBERT H. et al., Petitioners and Respondents, v.
WARREN B. et al., Objectors and Appellants.

COUNSEL

M. Van Smith, Burton J. Goldstein, M. Reed Hunter, Goldstein, Barcelaux & Goldstein and Barbara R. Banke for Objectors and Appellants.

Jay M. Spears, Martin R. Glick, Howard, Rice, Nemerovski, Canady, Robertson & Falk and Robert H. Mnookin for Petitioners and Respondents.

Hanson, Bridgett, Marcus, Vlahos & Stromberg, Lawrence J. Nelson, Richard L. Meives, Kathleen A. Marafino, Munger, Tolles & Rickershauser, Charles D. Siegal, Carol S. Larson, James W. Ellis and Stanley S. Herr as Amici Curiae on behalf of Petitioners and Respondents.

Sterling L. Ross, Jr., for Minor.

## OPINION

**RACANELLI, P. J.**—Few human experiences evoke the poignancy of a filial relationship and the pathos attendant upon its disruption in society's effort to afford every child a meaningful chance to live life to its fullest promise. This appeal, posing a sensitive confrontation between the fundamental right of parental custody and the well being of a retarded child, reflects the deeply ingrained concern that the needs of the child remain paramount in the judicial monitoring of custody. In reaching our decision to affirm, we neither suggest nor imply that appellants' subjectively motivated custodial objectives affront conventional norms of parental fitness; rather, we determine only that on the unusual factual record before us, the challenged order of guardianship must be upheld in order to avert potential harm to the minor ward likely to result from appellants' continuing custody and to subserve his best interests.

### Procedural Background

Preliminarily, we trace the sequence of procedural events leading to our review.

On February 23, 1981, respondents Herbert and Patsy H. filed a petition for appointment as guardians of the person and estate of Phillip B., then 14 years of age. Phillip's parents, appellants Warren and Patricia B., appeared in opposition to the petition.

On August 7, 1981, following a 12-day trial, the trial court filed a lengthy memorandum of decision ordering—inter alia—1) the issuance of letters of guardianship to respondents with authority to permit a heart catheterization to be performed on Phillip, and 2) the immediate delivery (by appellants) of Phillip to the Sheriff and Juvenile Authority of Santa Clara County. ■ ■ ■ ■ That same day appellants filed a notice of appeal from both orders[1]

---

[1] Although the order granting guardianship is expressly appealable (Prob. Code, § 2750, subd. (a)), the order requiring delivery of Phillip to local authorities is nonappealable; accordingly, the purported appeal from the latter order must be dismissed. (See Code Civ. Proc., § 904.1, subd. (k); Prob. Code, § 2750.)

followed by a petition to this court for a writ of supersedeas which we summarily denied.

On August 20, 1981, the California Supreme Court granted appellants' petition for hearing, stayed the trial court's order authorizing heart catheterization and retransferred the cause to this court with directions to issue an order to show cause why a writ of supersedeas should not issue.

Meanwhile, on September 24, the trial court filed formal findings of fact and conclusions of law and entered a "final order" confirming issuance of letters of guardianship and authorizing a heart catheterization. ██ ██ ██ A second notice of appeal specifying both orders was thereafter filed by appellants.[2]

On October 19, 1981, we again denied supersedeas in an unpublished opinion.

On November 18, 1981, the California Supreme Court granted a second petition for hearing, issued its writ of supersedeas limited to the trial court's orders of August 7 and September 24 "insofar as they give authority for a heart catheterization upon Phillip B.," and retransferred the cause to this court for determination of the merits of the appeal upon the completed record and full briefing. Thereafter, the matter was duly argued and submitted for decision.

Appellants raise several claims of reversible error relating to the sufficiency of evidence to support the findings, the admissibility of certain evidence and procedural due process. For the reasons which we explain, we find no error as claimed and affirm the order or judgment appealed. We consider the claims asserted in a sequence promoting clarity and convenience of discussion.

## I

### Sufficiency of the Evidence

Appellants' dominant claim of insufficiency of substantial evidence to support the critical findings below triggers settled principles of review which may be briefly set forth:

██ " 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' (*Primm* v.

[2]Since neither the findings nor conclusions are appealable under the provisions of the Probate Code, the purported appeal from that order must likewise be dismissed. (See Code Civ. Proc., § 904.1, subd. (k); Prob. Code, § 2750.)

*Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231]; *Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689].)" *(Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

■ "In reviewing for substantial evidence, we look at the evidence in support of the successful party, disregarding the contrary showing. *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; 6 Witkin, Cal. Procedure (2d ed. 1971) § 249, p. 4241.) All conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. *(Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; 6 Witkin, *supra,* § 245, pp. 4236, 4237.) Weight of the evidence must be disregarded. *(Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].)" *(Munoz* v. *Olin* (1979) 24 Cal.3d 629; 635-636 [156 Cal.Rptr. 727, 596 P.2d 1143].)

We discuss the evidence in the record in some detail in light of such governing principles.

Phillip B. was born on October 16, 1966, with Down's Syndrome, a chromosomal anomaly—usually the presence of an extra chromosome attached to the number 21 pair—resulting in varying degrees of mental retardation and a number of abnormal physical characteristics. Down's Syndrome reportedly occurs in approximately $\frac{1}{10}$ of 1 percent of live births.[3]

Appellants, deeply distraught over Phillip's disability, decided upon institutionalization, a course of action recommended by a state social worker and approved by appellants' pediatrician. A few days later, Phillip was transferred from the hospital to a licensed board and care facility for disabled youngsters. Although the facility was clean, it offered no structured educational or developmental programs and required that all the children (up to eight years of age) sleep in cribs. Appellants initially visited Phillip frequently; but soon their visits became less frequent and they became more detached from him.

When Phillip was three years old a pediatrician informed appellants that Phillip had a congenital heart defect, a condition afflicting half of Down's Syndrome children. (Smith & Wilson, *supra,* p. 41.) Open heart surgery was suggested when Phillip attained age six. However, appellants took no action to investigate or remedy the suspected medical problem.

After the board and care facility had been sold during the summer of 1971, appellants discovered that the condition of the facility had seriously deteriorated

---

[3] A detailed description of the causes and characteristics of Down's Syndrome is found in the well recognized publication of Smith & Wilson, The Child with Down's Syndrome (Mongolism) (1973) pages 3-44 (hereafter Smith & Wilson).

under the new management; it had become dirty and cluttered with soiled clothing, and smelled strongly of urine. Phillip was very thin and listless and was being fed watery oatmeal from a bottle. At appellants' request, a state social worker arranged for Phillip's transfer in January 1972, to We Care, a licensed residential facility for developmentally disabled children located in San Jose, where he remained up to the time of the trial.

At that time, the facility—which cared for about 20 children more severely handicapped than Phillip—operated under very limited conditions: it had no programs of education or therapy; the children were not enrolled in outside programs; the facility lacked an outdoor play area; the building was in poor repair; and the kitchen had only a two-burner hot plate used to cook pureed food.

In April 1972, We Care employed Jeanne Haight (later to become program director and assistant administrator of the facility) to organize a volunteer program. Mrs. Haight quickly noticed Phillip's debilitated condition. She found him unusually small and thin for his age (five); he was not toilet trained and wore diapers, still slept in a crib, walked like a toddler, and crawled down stairs only inches high. His speech was limited and mostly unintelligible; his teeth were in poor condition.

Mrs. Haight, who undertook a recruitment program for volunteers, soon recruited respondent Patsy H., who had helped to found a school for children with learning disabilities where Mrs. Haight had once been vice principal. Mrs. H. began working at We Care on a daily basis. Her husband, respondent Herbert H., and their children, soon joined in the volunteer activities.

Mrs. H., initially assigned to work with Phillip and another child, assisted Phillip in experimenting with basic sensory experiences, improving body coordination, and in overcoming his fear of steps. Mr. H. and one of the H. children helped fence the yard area, put in a lawn, a sandbox, and install some climbing equipment.

Mrs. Haight promptly initiated efforts to enroll Phillip in a preschool program for the fall of 1972, which required parental consent.[4] She contacted Mr. B. who agreed to permit Phillip to participate provided learning aptitude could be demonstrated. Mrs. H. used vocabulary cards to teach Phillip 25 to 50 new words and to comprehend word association. Although Mr. B. failed to appear at the appointed time in order to observe what Phillip had learned, he eventually

---

[4]Apparently, Phillip had received no formal preschool education for the retarded even though such training programs were available in the community. Expert testimony established that early introduction to preschool training is of vital importance in preparing a retarded child for entry level public education.

gave his parental consent enabling Phillip to attend Hope Preschool in October 1972.

Respondents continued working with Phillip coordinating their efforts with his classroom lessons. Among other things, they concentrated on development of feeding skills and toilet training and Mr. H. and the two eldest children gradually became more involved in the volunteer program.

Phillip subsequently attended a school for the trainable mentally retarded (TMR) where the children are taught basic survival words. They are capable of learning to feed and dress themselves appropriately, doing basic community activities such as shopping, and engaging in recreational activities. There is no attempt to teach them academics, and they are expected to live in sheltered settings as adults. In contrast, children capable of attending classes for the educable mentally retarded (EMR) are taught reading, writing, and simple computation, with the objective of developing independent living skills as adults.

A pattern of physical and emotional detachment from their son was developed by appellants over the next several years. In contrast, during the same period, respondents established a close and caring relationship with Phillip. Beginning in December 1972, Phillip became a frequent visitor at respondents' home; with appellants' consent, Phillip was permitted to spend weekends with respondents, a practice which continued regularly and often included weekday evenings. At the same time, respondents maintained frequent contact with Phillip at We Care as regular volunteer visitors. Meanwhile, appellants visited Phillip at the facility only a few times a year; however, no overnight home visits occurred until after the underlying litigation ensued.

Respondents played an active role in Phillip's behavorial development and educational training. They consistently supplemented basic skills training given Phillip at We Care.[5]

Phillip was openly accepted as a member of the H. family whom he came to love and trust. He eventually had his own bedroom; he was included in sharing household chores. Mr. H. set up a workbench for Phillip and helped him make simple wooden toys; they attended special Boy Scout meetings together. And Phillip regularly participated in family outings. Phillip referred to the H. residence as "my house." When Phillip began to refer to the H.'s as "Mom" and "Dad," they initially discouraged the familar reference, eventually suc-

---

[5]In addition to their efforts to improve Phillip's communication and reading skills through basic sign language and word association exercises, respondents toilet-trained Phillip and taught him to use eating utensils and to sleep in a regular bed (the latter frequently monitored during the night).

ceeding in persuading Phillip to use the discriminate references "Mama Pat" and "Dada Bert" and "Mama B." and "Daddy B."[6] Both Mrs. Haight and Phillip's teacher observed significant improvements in Phillip's development and behavior. Phillip had developed, in Mrs. Haight's opinion, "true love and strong [emotional] feelings" for respondents.

Meanwhile, appellants continued to remain physically and emotionally detached from Phillip. The natural parents intellectualized their decision to treat Phillip differently from their other children. Appellants testified that Phillip, whom they felt would always require institutionalization, should not be permitted to form close emotional attachments which—upon inevitable disruption— would traumatize the youngster.

In matters of Phillip's health care needs, appellants manifested a reluctant—if not neglectful—concern. When Dr. Gathman, a pediatric cardiologist, diagnosed a ventricular septal defect[7] in Phillip's heart in early 1973 and recommended catheterization (a medically accepted presurgery procedure to measure pressure and to examine the interior of the heart), appellants refused their consent.

In the spring of 1977, Dr. Gathman again recommended heart catheterization in connection with the anticipated use of general anesthesia during Phillip's major dental surgery. Appellants consented to the preoperative procedure which revealed that the heart defect was surgically correctible with a maximum risk factor of 5 percent. At a conference attended by appellants and Mrs. Haight in June 1977, Dr. Gathman recommended corrective surgery in order to avoid a progressively deteriorating condition resulting in a "bed-to-chair existence" and the probability of death before the age of 30.[8] Although Dr. Gathman—as requested by Mrs. B.—supplied the name of a parent of Down's Syndrome children with similar heart disease, no contact was ever made. Later that summer, appellants decided—without obtaining an independent medical consultation—against surgery. Appellants' stated reason was that Dr. Gathman had "painted" an inaccurate picture of the situation. They felt that surgery would be merely life-prolonging rather than life-saving, presenting the possibility that

---

[6]At respondents' suggestion, Mrs. Haight requested a photograph of appellants to show Phillip who his parents were; but appellants failed to provide one.

[7]The disease, found in a large number of Down's Syndrome children (see Smith & Wilson, *supra*, at p. 41), consists of an opening or "hole" between the heart chambers resulting in elevated blood pressure and impairment of vascular functions. The disease can become a progressive, and ultimately fatal, disorder.

[8]Dr. Gathman's explicit description of the likely ravages of the disease created anger and distrust on the part of appellants and motivated them to seek other opinions and to independently assess the need for surgery.

they would be unable to care for Phillip during his later years.[9] A few months later, in early 1978, appellants' decision was challenged in a juvenile dependency proceeding initiated by the district attorney on the ground that the withholding of surgery constituted neglect within the meaning of Welfare and Institutions Code section 300, subdivision (b); the juvenile court's dismissal of the action on the basis of inconclusive evidence was ultimately sustained on appeal (*In re Phillip B.* (1979) 92 Cal.App.3d 796 [156 Cal.Rptr. 48]; cert. den. *sub nom. Bothman* v. *Warren B.* (1980) 445 U.S. 949 [63 L.Ed.2d 784, 100 S.Ct. 1597].

In September 1978, upon hearing from a staff member of We Care that Phillip had been regularly spending weekends at respondents' home, Mr. B. promptly forbade Phillip's removal from the facility (except for medical purposes and school attendance) and requested that respondents be denied personal visits with Phillip at We Care. Although respondents continued to visit Phillip daily at the facility, the abrupt cessation of home visits produced regressive changes in Phillip's behavior: he began acting out violently when respondents prepared to leave, begging to be taken "home"; he resorted to profanity; he became sullen and withdrawn when respondents were gone; bed wetting regularly occurred, a recognized symptom of emotional disturbance in children. He began to blame himself for the apparent rejection by respondents; he began playing with matches and on one occasion he set his clothes afire; on another, he rode his tricycle to respondents' residence a few blocks away proclaiming on arrival that he was "home." ██ ██ He continuously pleaded to return home with respondents. Many of the behavorial changes continued to the time of trial.[10]

Appellants unsuccessfully pressed to remove Phillip from We Care notwithstanding the excellent care he was receiving. However, in January 1981, the regional center monitoring public assistance for residential care and training of the handicapped, consented to Phillip's removal to a suitable alternate facility. Despite an extended search, none could be found which met Phillip's in-

[9]Oddly, Mr. B. expressed no reluctance in the hypothetical case of surgery for his other two sons if they had the "same problem," justifying the distinction on the basis of Phillip's retardation.

[10]During a pretrial psychological evaluation, Phillip suddenly recoiled in his chair, hiding his face, in response to the examiner's question how he felt about being unable to visit respondents' home. In the examiner's opinion, such reaction manifested continuing emotional pain in light of the earlier trauma and regressive behavior following termination of home visits.

Contrary to appellants' argument, they were not entitled to be present at the pretrial psychological examination. (Cf. *Edwards* v. *Superior Court* (1976) 16 Cal.3d 905, 909-912 [130 Cal.Rptr. 14, 549 P.2d 846].) The need for an accurate report, itself subservient to the interest of an effective examination through a free and open communication exchange, is adequately safeguarded through discovery, cross-examination and production of other expert testimony.

dividualized needs. Meanwhile, Phillip continued living at We Care, periodically visiting at appellant's home. But throughout, the strong emotional attachment between Phillip and respondents remained intact.

Evidence established that Phillip, with a recently tested I.Q. score of 57,[11] is a highly functioning Down's Syndrome child capable of learning sufficient basic and employable skills to live independently or semi-independently in a noninstitutional setting.

■ Courts generally may appoint a guardian over the person or estate of a minor "if it appears necessary or convenient." (Prob. Code, § 1514, subd. (a).) But the right of parents to retain custody of a child is fundamental and may be disturbed " '. . . only in extreme cases of persons acting in a fashion incompatible with parenthood.' " (*In re Angelia P.* (1981) 28 Cal.3d 908, 916 [171 Cal.Rptr. 637, 623 P.2d 198], quoting *In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514].) Accordingly, the Legislature has imposed the stringent requirement that before a court may make an order awarding custody of a child to a nonparent without consent of the parents, "it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child." (Civ. Code, § 4600, subd. (c); see *In re B. G.* (1974) 11 Cal.3d 679, 695-699 [114 Cal.Rptr. 444, 523 P.2d 244].)[12] That requirement is equally applicable to guardianship proceedings under Probate Code section 1514, subdivision (b). The legislative shift in emphasis from parental unfitness to detriment to the child did not, however, signal a retreat from the judicial practice granting custodial preference to nonparents "only in unusual and extreme cases." (*In re B. G., supra,* 11 Cal.3d 679, 698, see *Guardianship of Marino* (1973) 30 Cal.App.3d 952, 958 [106 Cal.Rptr. 655].)

■ The trial court expressly found that an award of custody to appellants would be harmful to Phillip in light of the psychological or "de facto" parental relationship established between him and respondents.[13] Such relationships

---

[11]A retarded child with an I.Q. range of 55-70 is generally considered as mildly retarded and classified as educable under California school standards.

[12]Civil Code section 4600 was enacted in response to the celebrated case of *Painter* v. *Bannister* (1966) 258 Iowa 1390 [140 N.W.2d 152], cert. den. 385 U.S. 949 [17 L.Ed.2d 227, 87 S.Ct. 317], in which the state court awarded custody of a young boy to his grandparents because it disapproved of the father's "Bohemian" lifestyle in California (See *In re B. G., supra,* 11 Cal.3d at pp. 697-698, citing Rep. of Assem. Judiciary Com., 4 Assem. J. (1969 Reg. Sess.) pp. 8060-8061.)

[13]We reject appellants' claim that the trial court's August 7, 1981, memorandum decision included no finding of detriment and that their notice of appeal from the guardianship order rendered the formal findings made on September 24, 1981, ineffectual. First, the memorandum decision explicitly cited threats of emotional, physical and medical harm in awarding custody to appellants. Moreover, proceedings affecting child custody orders are not stayed by appeal. (Code Civ. Proc., § 917.7; *Superior Court* v. *Dist. Court of Appeal* (1966) 65 Cal.2d 293, 296

have long been recognized in the fields of law and psychology. As Justice Tobriner has cogently observed, "The fact of biological parenthood may incline an adult to feel a strong concern for the welfare of his child, but it is not an essential condition; a person who assumes the role of parent, raising the child in his own home, may in time acquire an interest in the 'companionship, care, custody and management' of that child. The interest of the 'de facto parent' is a substantial one, recognized by the decision of this court in *Guardianship of Shannon* (1933) 218 Cal. 490 [23 P.2d 1020] and by courts of other jurisdictions and deserving of legal protection." (*In re B. G., supra,* 11 Cal.3d 679, 692-693 [fns. omitted], citing the seminal study of Goldstein, Freud & Solnit, Beyond the Best Interests of the Child (1973) pp. 17-20, hereafter Goldstein.) Persons who assume such responsibility have been characterized by some interested professional observers as "psychological parents": "Whether any adult becomes the psychological parent of a child is based . . . on day-to-day interaction, companionship, and shared experiences. The role can be fulfilled either by a biological parent or by an adoptive parent or by any other caring adult—but never by an absent, inactive adult, whatever his biological or legal relationship to the child may be." (Goldstein, *supra,* p. 19.)

Appellants vigorously challenge the evidence and finding that respondents have become Phillip's de facto or psychological parents since he did not reside with them full time, as underscored in previous California decisions which have recognized de facto parenthood. (See, e.g., *In re Lynna B.* (1979) 92 Cal.App.3d 682 [155 Cal.Rptr. 256]; *In re Volkland* (1977) 74 Cal.App.3d 674 [141 Cal.Rptr. 625]; *Chaffin* v. *Frye* (1975) 45 Cal.App.3d 39 [119 Cal.Rptr. 22]; *Guardianship of Marino, supra,* 30 Cal.App.3d 952.) They argue that the subjective concept of psychological parenthood, relying on such nebulous factors as "love and affection" is susceptible to abuse and requires the countervailing element of objectivity provided by a showing of the child's long-term residency in the home of the claimed psychological parent.

We disagree. Adoption of the proposed standard would require this court to indorse a novel doctrine of child psychology unsupported either by a demonstrated general acceptance in the field of psychology or by the record before us. Although psychological parenthood is said to result from "day-to-day attention to [the child's] needs for physical care, nourishment, comfort, affection, and stimulation" (Goldstein, *supra,* p. 17), appellants fail to point to any authority or body of professional opinion that equates daily attention with full-time

[54 Cal.Rptr. 119, 419 P.2d 183].) The Supreme Court's stay order, issued before the court rendered its findings and conclusions (see Code Civ. Proc., § 923), was expressly limited to the August 7 order authorizing a heart catheterization; thus, the trial court retained jursidiction as to all proceedings otherwise affecting the award of custody, including adoption of findings and conclusions.

residency.[14] To the contrary, the record contains uncontradicted expert testimony that while psychological parenthood usually will require residency on a "24-hour basis," it is not an absolute requirement; further, that the frequency and quality of Phillip's weekend visits with respondents, together with the regular weekday visits at We Care, provided an adequate foundation to establish the crucial parent-child relationship.

Nor are we persuaded by appellants' suggested policy considerations concerning the arguably subjective inquiry involved in determining psychological parenthood. Trial fact finders commonly grapple with elusive subjective legal concepts without aid of "countervailing" objective criteria. A fortiori, in enacting Civil Code section 4600, the Legislature purposefully refrained from prescribing specific criteria in determining whether parental custody would be "detrimental," reasoning that "[i]t is a nearly impossible task to devise detailed standards which will leave the courts sufficient flexibility to make the proper judgment in all cases." (Rep. of Assem. Judiciary Com., 4 Assem. J. (1969 Reg. Sess.) p. 8061.) Moreover, the suggested standard is itself vulnerable to a claim of undue subjectivity in its vague requirement of residency for a "considerable period of time."[15]

■ Appellants also challenge the sufficiency of the evidence to support the finding that their retention of custody would have been detrimental to Phillip. In making the critical finding, the trial court correctly applied the "clear and convincing" standard of proof necessary to protect the fundamental rights of parents in all cases involving a nonparent's bid for custody. (See *In re B. G., supra,* 11 Cal.3d 679, 699 [Civ. Code, § 4600 sanctions a nonparent custodial award "only upon a *clear showing* that such award is essential to avert harm to the child"; italics ours]; cf. *In re Angelia P., supra,* 28 Cal.3d at pp. 918-919 ["clear and convincing evidence" standard applicable in proceedings under

---

[14]Appellants cite one survey which criticizes certain conclusions in Goldstein in pejorative terms matched, regrettably, by the stridency of appellants' brief. Therein, the author challenges "absolute use of psychological parenthood . . . as the single standard to determine best interest of the child," because any nonparent caretaker can claim psychological parenthood "whether the custodian is a kidnapper, a band of gypsies, a baby-sitter or nanny, the child-snatching noncustodial parent, the grandparent resorted to in desperation, or anyone else. . . ." (Crouch, *An Essay on the Critical and Judicial Reception of Beyond the Best Interests of the Child* (1979) 13 Fam. L.Q. 49, 103.)

[15]Appellants also fear that, absent a full-time residency requirement, anyone who visits an institutionalized child can lay claim to psychological parenthood. As earlier discussed, development of a parent-child relationship requires long-term nurturing and fulfillment of the child's total needs which can rarely occur without full-time residency. But it was manifested here only as a direct result of respondents' unique relationship with Phillip as We Care volunteers, their previously uninterrupted weekend close contacts and appellants' physical and emotional detachment from the child. All of such important factors contributed to respondents' ability to devote the enormous amount of time and loving care essential to fill the tangible and emotional needs in Phillip's life.

Civ. Code, § 232 to terminate parent-child relationship].) This court must, as noted, review the whole record in the light most favorable to the award of guardianship to determine whether there was substantial evidence that parental custody would have been detrimental to Phillip based on clear and convincing evidence. (*In re Angelia P., supra,* 28 Cal.3d at p. 924; see *In re Lynna B., supra,* 92 Cal.App.3d 682, 695; *In re Heidi T.* (1978) 87 Cal.App.3d 864, 870 [151 Cal.Rptr. 263]; *In re Volkland, supra,* 74 Cal.App.3d 674, 678-679.)

The record contains abundant evidence that appellants' retention of custody would cause Phillip profound emotional harm. Notwithstanding Phillip's strong emotional ties with respondents, appellants abruptly foreclosed home visits and set out to end all contact between them. When Phillip's home visits terminated in 1978, he displayed many signs of severe emotional trauma: he appeared depressed and withdrawn and became visibly distressed at being unable to return to "my house," a request he steadily voiced up until trial. He became enuretic, which a psychologist, Dr. Edward Becking, testified indicates emotional stress in children. (See *In re Lynna B., supra,* 92 Cal.App.3d 682, 697 [psychiatric evidence that bed wetting is symptomatic of detriment suffered by children when ties with "psychological" parents are severed].) Dr. Becking testified to other signs of emotional disturbance which were present nearly three years after the termination of home visits.[16]

Our law recognizes that children generally will sustain serious emotional harm when deprived of the emotional benefits flowing from a true parent-child relationship. (See, e.g., *In re Lynna B., supra,* 92 Cal.App.3d 682, 697; *In re D. L. C.* (1976) 54 Cal.App.3d 840, 849 [126 Cal.Rptr. 863]; *In re Reyna* (1976) 55 Cal.App.3d 288, 302 [126 Cal.Rptr. 138]; *Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 706-707 [117 Cal.Rptr. 856, 84 A.L.R.3d 654]; *Guardianship of Marino, supra,* 30 Cal.App.3d 952, 956, 961; *Guardianship of Casad* (1951) 106 Cal.App.2d 134, 152 [234 P.2d 647].)

There was uncontroverted expert testimony that Phillip would sustain further emotional trauma in the event of total separation from respondents: the testimony indicated that, as with all children, Phillip needs love and affection, and he would be profoundly hurt if he were deprived of the existing psychological parental relationship with respondents in favor of maintaining unity with his biological parents.

Phillip's conduct unmistakably demonstrated that he derived none of the emotional benefits attending a close parental relationship largely as a result of

---

[16]Specifically, Phillip's increasing self-criticism, his unsupervised arrival at respondents' home; his repeated attempts to join respondents when they were ready to leave the We Care facility, and the painful recoiling reaction which occurred in the interview setting.

appellants' individualized decision to abandon that traditional supporting role. Dr. Becking testified that no "bonding or attachment" has occurred between Phillip and his biological parents, a result palpably consistent with appellants' view that Phillip had none of the emotional needs uniquely filled by natural parents. We conclude that such substantial evidence adequately supports the finding that parental custody would have resulted in harmful deprivation of these human needs contrary to Phillip's best interests.

Finally, there was also evidence that Phillip would experience educational and developmental injury if parental custody remains unchanged. At Phillip's functioning level of disability,[17] he can normally be expected to live at least semi-independently as an adult in a supervised residential setting and be suitably trained to work in a sheltered workshop or even a competitive environment (e.g., performing assembly duties or custodial tasks in a fast-food restaurant). Active involvement of a parent figure during the formative stages of education and habilitation is of immeasurable aid in reaching his full potential. Unfortunately, appellants' deliberate abdication of that central role would effectively deny Phillip any meaningful opportunity to develop whatever skills he may be capable of achieving. Indeed, Dr. Becking testified that further separation from respondents would not only impair Phillip's ability to form new relationships but would "for a long while" seriously impair Phillip's development of necessary prevocational and independent-living skills for his future life.

Nor can we overlook evidence of potential physical harm to Phillip due to appellants' passive neglect in response to Phillip's medical condition. Although it appears probable that the congenital heart defect is no longer correctible by surgery,[18] the trial court could have reasonably concluded that appellants' past conduct reflected a dangerously passive approach to Phillip's future medical needs.[19]

It is a clearly stated legislative policy that persons with developmental disabilities shall enjoy—inter alia—the right to treatment and rehabilitation ser-

---

[17]As earlier noted, Phillip's most recent I.Q. score of 57 places him in the higher classification range of mildly retarded. Current definitions of intelligence include both I.Q. scores and measures of "adaptive behavior" (the degree to which a person meets the standards of personal independence and social responsibilities of one's age and cultural group).

[18]A pediatric cardiologist estimated that the surgery now might have a one-third chance of harming him, a one-third chance of helping him, and a one-third chance of causing no appreciable change in his condition. Dr. Gathman testified that it is "highly probable" that Phillip's condition is no longer correctible by surgery, but that a heart catheterization is required to be certain.

[19]Notably, the failure to obtain competent medical advice concerning the heart disease and the admitted willingness to forego medical treatment solely by reason of Phillip's retarded condition. The gravity of such dangerous inaction was dramatically illustrated by Mr. B.'s reaction to Phillip's recent undiagnosed episodes of apparent semi-consciousness—discounting their existence without even the benefit of a medical consultation.

vices, the right to publicly supported education, the right to social interaction, and the right to prompt medical care and treatment. (Welf. & Inst. Code, § 4502.) Moreover, the legislative purpose underlying Civil Code section 4600 is to protect the needs of children generally " '. . . to be raised with love, emotional security and physical safety.' " (*In re D. L. C., supra,* 54 Cal.App.3d 840, 851.) When a trial court is called upon to determine the custody of a developmentally disabled or handicapped child, as here, it must be guided by such overriding policies rather than by the personal beliefs or attitudes of the contesting parties, since it is the child's interest which remains paramount. (Cf. *In re Marriage of Kern* (1978) 87 Cal.App.3d 402, 410 [150 Cal.Rptr. 860] [primary consideration in custodial disputes centers upon child's best interests and motivational interest of adversary parties is irrelevant].) Clearly, the trial court faithfully complied with such legislative mandate in exercising its sound discretion based upon the evidence presented. We find no abuse as contended by appellants.

We strongly emphasize, as the trial court correctly concluded, that the fact of detriment *cannot* be proved solely by evidence that the biological parent has elected to institutionalize a handicapped child, or that nonparents are able and willing to offer the child the advantages of their home in lieu of institutional placement. Sound reasons may exist justifying institutionalization of a handicapped child. But the totality of the evidence under review permits of no rational conclusion other than that the detriment caused Phillip, and its possible recurrence, was due not to appellants' choice to institutionalize but their calculated decision to remain emotionally and physically detached—abdicating the conventional role of competent decisionmaker in times of demonstrated need—thus effectively depriving him of *any* of the substantial benefits of a true parental relationship. *It is the emotional abandonment of Phillip, not his institutionalization,* which inevitably has created the unusual circumstances which led to the award of limited custody to respondents. We do not question the sincerity of appellants' belief that their approach to Phillip's welfare was in their combined best interests. But the record is replete with substantial and credible evidence supporting the trial court's determination, tested by the standard of clear and convincing proof, that appellants' retention of custody has caused and will continue to cause serious detriment to Phillip and that his best interests will be served through the guardianship award of custody to respondents. In light of such compelling circumstances, no legal basis is shown to disturb that carefully considered determination.

## II

### Due Process

Appellants assert several claims of due process violations. Our examination of each discloses no merit.

■ Relying chiefly on *In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428] [due process requirement of advance written notice of specific issues in juvenile "delinquency" proceedings] (see also *Memphis Light, Gas & Water Div.* v. *Craft* (1978) 436 U.S. 1, 14 [56 L.Ed.2d 30, 42, 98 S.Ct. 1554]; *Wolff* v. *McDonnell* (1974) 418 U.S. 539, 564 [41 L.Ed.2d 935, 955-956, 94 S.Ct. 2963]), appellants initially challenge the sufficiency of the guardianship petition[20] in its failure to allege specific facts showing detriment against which they were required to defend. As respondents correctly indicate, the approved form of guardianship petition (see rule 982(b), Cal. Rules of Court) fully complied with the statutory requirements governing guardianship proceedings involving nonparent custodial issues. (Prob. Code, §§ 1514, subd. (a); 1514, subd. (b); Civ. Code, § 4600.) Probate Code section 1514, subdivision (a) simply requires a standard allegation to be proved that the requested guardianship is "necessary and convenient"; Probate Code section 1514, subdivision (b) recites that the appointment of a personal guardian of a minor is "governed by the provisions of Section 4600 of the Civil Code," which expressly include a showing of detriment whenever custody is sought by a nonparent.

Of course, the natural parents are entitled to the same right to adequate notice in child custody proceedings. (See *Armstrong* v. *Manzo* (1965) 380 U.S. 545, 550 [14 L.Ed.2d 62, 65-66, 85 S.Ct. 1187].) But due process does not require that a guardianship petition include a detailed statement of the underlying specific facts upon which it is based. The requirement of fact-pleading is a creature of statute (compare Fed. Rules Civ. Proc., rule 8, 28 U.S.C.) and as such, may be limited by statute precisely as section 4600 limits the factual pleading of detriment in custody matters. Due process requires only that the petition give adequate notice to the parties of the specific issues presented in order to permit a reasonable opportunity to prepare for the hearing on the petition.

Appellants received such notice and appeared at the scheduled hearing on the guardianship petition. It was unnecessary for the petition to allege that parental custody would be detrimental to the child since the issue of detriment is itself prescribed by statute. (Civ. Code, § 4600.) The available civil discovery procedures afforded appellants a reasonable opportunity to prepare for the hearing by identifying and narrowing the issues in a manner far more comprehensive than could be expected of the approved form of a guardianship pleading. If, as appellants contend, respondents' answers to interrogatories were confusing and

---

[20]Civil Code section 4600, subdivision (c), provides in pertinent part that "[a]llegations that parental custody would be detrimental to the child, other than a statement of that ultimate fact, shall not appear in the pleadings."

evasive, appellants could and should have filed appropriate motions to compel further answers or for protective orders.

In the final analysis, due process is a flexible concept which calls for such procedural protections as each case demands. (*Memphis Light, Gas & Water Div.* v. *Craft, supra,* 436 U.S. 1, 15, fn. 15. [56 L.Ed.2d 30, 42, 98 S.Ct. 1554].) In proceedings initiated by a nonparent involving a disputed issue of custody, the state has a significant interest in protecting the child from public disclosure of sensitive information regarding the question whether parental custody would be detrimental. The state is equally concerned with allowing trial courts to make a confidential determination whether the public should be excluded from the hearing on the issue of detriment. (Civ. Code, § 4600, subd. (c); cf. *Globe Newspaper Co.* v. *Superior Court* (1982) 457 U.S. 596, 609 [73 L.Ed.2d 248, 258-259, 102 S.Ct. 2613] [interest in "safeguarding the physical and psychological well-being of a minor" can justify closure of trials on a case-by-case analysis].) While such interests must yield to the basic requirement of adequate notice (*In re Gault, supra,* 387 U.S. at p. 33 [18 L.Ed.2d at p. 549]), no irreconcilable conflict is presented here because civil discovery enables the parties to adequately prepare and to meet the prescribed issue of detriment and sumultaneously affords confidentiality through the use of protective orders. Accordingly, we find no constitutional defect in the form of pleading and notice provided as contended.

■ Appellants further claim that the absence of a specific factual pleading permitted respondents to offer remote and irrelevant evidence of their past conduct and obscured the fact that the same issues had already been adjudicated in the 1978 dependency proceeding.

Neither claim withstands scrutiny. Evidence of past conduct was admissible in any event as an indication of probable further conduct in relation to Phillip's welfare. (*In re Lynna B., supra,* 92 Cal.App.3d 682, 700, quoting *In re Norma M.* (1978) 77 Cal.App.3d 110, 116 [143 Cal.Rptr. 412].) The 1978 proceedings involved a single discrete issue (whether the denial of heart surgery constituted a failure to provide the "necessities of life"), whereas the present action deals with the broader question of detriment to the child from parental custody linked with his best interests. (Civ. Code, § 4600.)

■ We next consider appellants' contention that it was error to order a heart catheterization be performed on Phillip in the absence of separate petition and hearing on that issue. The challenged orders authorized the appointed guardians to permit the diagnostic procedure "in order to investigate [Phillip's] medical condition," but prohibited other surgery without further court order.

Under the relevant statutory scheme, nonemergency "surgery" may not be performed upon a ward 14 years of age or older "without either (1) the consent of both the ward and the guardian or (2) a court order obtained pursuant to Section 2357. . . ." (Prob. Code, § 2353, subd. (b).) Section 2357 prescribes a detailed procedure by which the guardian may petition for an order authorizing medical treatment for a ward unable to give an informed consent.

Assuming arguendo that a heart catheterization procedure constitutes a form of "surgery"[21] within the meaning of section 2353, appellants neither cite nor are we aware of any authority which requires a separate petition and independent hearing where, as here, the statutory information (Prob. Code, § 2357, subd. (c)) is presented in the course of the guardianship proceeding and the court makes the required findings. (Prob. Code, § 2357, subd. (h).) In the special circumstances shown, it would have been a wasteful duplication to insist upon a wholly separate proceeding to reach the same issue on substantially the same proofs. In the interest of judicial economy, we construe section 2357 to permit such surgery authorization without a separate petition when the essential information is presented timely and the issues fully litigated and determined during the guardianship proceedings, as clearly manifested herein. Thus, we find the order authorizing heart catheterization to be free of procedural defect.

■ Appellants' remaining due process complaint is directed to the trial court's receipt of a confidential juvenile probation department report bearing upon respondents' suitability as guardians. (See Civ. Code, § 4602; Prob. Code, § 1513, subd. (b).) The report, a copy of which had been mailed to appellants, was received and reviewed by the court after its August 7 decision without hearing. However, the report was never admitted into evidence.

Due process considerations generally mandate the right to an evidentiary hearing to question the contents of the report or to permit counterevidence. (*Wheeler* v. *Wheeler* (1973) 34 Cal.App.3d 239, 242 [109 Cal.Rptr. 782].) But the failure to object to the report or request a hearing effectively waives such right. (*Long* v. *Long* (1967) 251 Cal.App.2d 732, 736-737 [59 Cal.Rptr. 790].) Here, although appellants were well aware of the report and its contents with ample opportunity to register objections or demand a hearing (as late as the Sept. 24 final guardianship order), appellants waived their right by choosing to remain silent. Thus, they cannot now be heard to complain of the lack of a hearing.

---

[21]A conclusion reasonably supported by the broad definition of the term contained in standard references (Stedman's Medical Dict. (4th unabr. lawyers' ed. 1976) p. 1370; Black's Law Dict. (5th ed. 1979) p. 1293.).

## III

### Exclusion of Evidence

In a separate brief filed under seal, appellants argue that the trial court committed an abuse of discretion in excluding proposed testimony bearing upon respondents' competency and suitability to act as Phillip's guardians. Following an offer of proof and voir dire examination, the court rejected the proffered evidence on grounds of irrelevancy, untimeliness and the likelihood of substantial delay to reopen the evidence. It appears that appellants had rested on July 17 except for the brief testimony of Michael, their son and final witness. On July 27, the date set for closing argument, appellants sought leave to reopen in order to submit testimony relating to respondents' fitness for appointment. After hearing argument, the court rejected the offer of proof and denied leave to reopen on the stated grounds.

Preliminarily, we conclude from the state of the record that appellants' attempts to call additional witnesses on the day set for argument amounted in legal effect to a motion to reopen in order to produce additional evidence. A request to reopen for further evidence is addressed to the discretion of the trial court whose determination is binding on appeal in the absence of palpable abuse. (*Stewart* v. *Cox* (1961) 55 Cal.2d 857, 866 [13 Cal.Rptr. 521, 362 P.2d 345]; *Sanchez* v. *Bay General Hospital* (1981) 116 Cal.App.3d 776, 793 [172 Cal.Rptr. 342]; *Cappa* v. *Oscar C. Holmes, Inc.* (1972) 25 Cal.App.3d 978, 985 [102 Cal.Rptr. 207]; *Ducray* v. *Ducray* (1967) 257 Cal.App.2d 480, 484 [64 Cal.Rptr. 825].) The extent to which the trial may be protracted is a relevant consideration. (See *Lyons* v. *Lyons* (1961) 190 Cal.App.2d 788, 791 [12 Cal.Rptr. 349].) And denial of a motion to reopen will be upheld if the moving party fails to show diligence or that he had been misled by the other party. (*Cappa* v. *Oscar C. Holmes, Inc., supra,* 25 Cal.App.3d at p. 985; *Estate of Horman* (1968) 265 Cal.App.2d 796, 807 [71 Cal.Rptr. 780]; *Giomi* v. *Viotti* (1956) 144 Cal.App.2d 714, 718 [301 P.2d 597]; *Kaplan* v. *Hacker* (1952) 113 Cal.App.2d 571, 573 [248 P.2d 464]; see *In re T. M. R.* (1974) 41 Cal.App.3d 694, 702-703 [116 Cal.Rptr. 292].)

While better practice would indicate that all information bearing on the best interests of the child in a custody dispute should be considered (*Faulkner* v. *Faulkner* (1957) 148 Cal.App.2d 102, 108 [306 P.2d 585]), it does not follow—without more—that the discretionary denial of a motion to reopen warrants reversal. Only in rare instances involving evidence of crucial significance will reviewing courts reverse a decision where denial has resulted in such exclusion. (See, e.g., *In re Marriage of Olson* (1980) 27 Cal.3d 414,

422 [165 Cal.Rptr. 820, 612 P.2d 910] [failure to reopen dissolution proceeding for current determination of community assets and debts]; *In re T. M. R., supra,* 41 Cal.App.3d 694, 702-703 [failure to reopen custody termination proceedings based on parent's incarceration to permit evidence that parent no longer incarcerated].)

Appellants' showing of diligence was minimal at best. Although aware of the general nature of the new evidence as early as the night of July 17, counsel offered no plausible explanation for the untimely disclosure. Additionally, appellants' belated claim of deception due to respondents' reply to an interrogatory whether the latter had ever received treatment for "mental illness" is unpersuasive. The use of such inexact expression could not reasonably be interpreted to include the fact of an earlier counselling incident.[22] Since the burden rested on appellants to submit clear and specific interrogatories, they cannot now complain of having been misled by the otherwise responsive answer given.

Unlike the unusual circumstances shown in *In re T. M. R., supra,* 41 Cal.App.3d 694 (in which recently acquired evidence of the mother's release from prison three weeks earlier would have mooted the basis for terminating custody), the excluded testimony under seal herein cannot be considered as equally significant to the question of the necessity for guardianship. In any case, a custodial award to a nonparent can yet serve a child's best interests in the sense of being the "least detrimental available alternative" (see *In re Angelia P., supra,* 28 Cal.3d 908, 916-917, citing Goldstein, *supra,* pp. 53-54) notwithstanding other evidence of a nonparent's past emotional difficulty requiring limited crisis counselling. Accordingly, we cannot conclude as a matter of law that it was error to exclude the proffered testimony in reaching the challenged award of guardianship in Phillip's best interests. Finally, the juvenile department report considered by the court provided some evidence favoring respondents' suitability as guardians which, of course, is subject to later termination if the best interests of the child so require. (See Prob. Code, § 1601.)[23]

In view of our determination, we need not discuss the remaining arguments raised in the briefs.

---

[22]The generic term "mental illness" is commonly understood to connote "a chronic or prolonged disorder [involving] deviations from the normal." (McGraw-Hill Dict. of Scientific and Technical Terms (1974) p. 924.)

[23]While unnecessary to decide, we question the trial court's apparent determination that Mrs. H.'s competency to serve as guardian was irrelevant. Although the focus has shifted from parental fitness to detriment (*In re B. G., supra,* 11 Cal.3d 679, 698; *Guardianship of Marino, supra,* 30 Cal.App.3d 952, 958), the mental competency of a nonparent seeking custody is logically relevant to the issue of the child's best interests.

The order or judgment from which the appeal is taken is affirmed. The purported appeal from the interim order of immediate delivery and findings and conclusions, and each, is dismissed. (See fns. 1 and 2, *ante.*)

Elkington, J., and Newsom, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 28, 1983. Grodin, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.