Filed 8/26/21  In re Alison O. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re ALISON O., a Person Coming Under the Juvenile Court Law. | B310338 (Los Angeles County Super. Ct. No. 19CCJP04159D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MARIA M., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Rudolph A. Diaz, Judge.  Affirmed.

Tungsten Legal and Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Maria M. (mother) challenges the juvenile court's termination of dependency jurisdiction over her 10-year-old daughter Alison O. and its issuance of an exit order awarding full legal and physical custody to Alison's father, Edgar O. (father), and limiting mother to monitored visits every other week.  We conclude that mother's challenges lack merit, and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

Mother and father have one child together, Alison, who was born in June 2011.[1]

Mother and father had a tumultuous relationship.  They had verbal arguments all the time.  In March 2011, mother got so upset from an argument with father that she slashed her abdomen and wrist with a knife—while six months pregnant with Alison.

---

1      Mother has three other children with different fathers— Roger (born 2004), Mercedez (born 2005), and Diamond (born 2007).  None of these children is involved in this appeal.

2

Mother and father broke off their romantic relationship in 2016, and informally shared custody of Alison.

In early 2019, father started dating someone new and mother became obsessed with father and his new girlfriend.

Mother would visit the girlfriend's social media accounts, download photos, and tell Alison things like "this is your new mom" and "your dad doesn't love us anymore."

In February 2019, mother called father pleading to get back together; on the call, mother threatened to kill herself, and after dousing herself with gasoline, told father that he was "going to hear it," struck a match, and lit her torso on fire, causing burns to her chest and neck. Alison came screaming to her mother's aid while the smoke alarms blared. After father rushed to mother's residence, mother told him, "You don't want to be with me . . . . I am going to finish the job." Although law enforcement responded to the emergency and she was placed on a psychiatric hold, mother later claimed she merely burned herself while cooking.

In April 2019, mother called father to tell him, "This is the last time you are going to hear from me." The same month, father received text messages from mother's brother notifying him that mother overdosed on pills because father did not want to be with her.

Through this period, mother repeatedly texted father with veiled and not-so-veiled threats of suicide, including "I'm done with this life" and "I'm going to kill myself" with a gun or by drowning.

Mother's obsessive behavior came to blows in mid-May 2019. When father arrived at mother's apartment complex to pick up Alison, mother started rifling through his car and found a bag of condoms. She proclaimed to then-eight-year-old Alison,

"these are what he fucks [his girlfriend] with."  Father recorded mother on video and she told Alison "you see how he wants me to go to jail," while Alison screamed and pleaded with father to delete the video.  Mother directed Alison to go through the car to find more condoms.  Mother grabbed an important receipt from father's car and after he yanked it back, the parents got into a physical altercation.  It was not captured on video and it is unclear who started it, but the altercation included father pinning mother down and mother head butting him in the mouth.

Mother has repeatedly denied having any mental health issues and consistently minimized her self-harming behavior.

## II.    Procedural Background

### A.    *Petition*

In July 2019, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over Alison based on (1) the parent's "history of engaging in violent altercations in the presence of [Alison]," including the May 2019 incident, which "places [Alison] at risk of serious physical harm, damage, and danger" (thereby rendering jurisdiction appropriate under Welfare and Institutions Code section 300, subdivisions (a) and (b)(1)),[2] and (2) mother's "mental and emotional problems[], including [her] suicidal ideations and self-harming behaviors," which "render . . . mother incapable of providing [Alison] with regular care and supervision" and place Alison "at risk of serious physical harm" as well as father's "failure to protect Alison" despite knowing of mother's problems (thereby rendering jurisdiction appropriate under section 300, subdivision (b)(1)).

---

[2]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

4

**B.** *Detention, jurisdiction and disposition*

In early July 2019, the juvenile court detained Alison from mother's custody and placed her with father, but ordered monitored visitation for mother twice a week.

In August and November 2019, the juvenile court sustained the domestic violence and mental health allegations against mother and father based on subdivision (b) of section 300, but dismissed the domestic violence allegation based on subdivision (a). At a December 2019 hearing, the court removed Alison from mother's custody. The court ordered the Department to provide family maintenance services to mother and father, ordered father to participate in individual counseling, and ordered mother to (1) complete courses on parenting and domestic violence, (2) participate in individual counseling with a licensed therapist, and (3) have a psychiatric evaluation and take all prescribed medications. The court emphasized that mother's counseling sessions should focus on, among other things, "the detrimental impact that exposing [Alison] to untreated mental health issues, suicidal ideations, volatile relationships, and domestic violence had on [Alison]."

The court set a hearing for June 2020 to determine whether to terminate jurisdiction under section 364. In light of the COVID-19 pandemic and other delays, the review hearing did not commence until December 2020.

**C.** *Progress during the review period*

During the yearlong period when Alison was in her father's custody, she was both safe and "happy."

Although mother completed the coursework part of her case plan and was "making some progress" in her therapy sessions, she twice stopped taking her prescribed medications—and falsely

5

reported that the psychiatrist told her to do so the second time. The therapy appeared to be having little or no effect on mother's behavior toward father and his girlfriend, as she still exhibited a "concerning" "fixation" on them, and had "continued communication dysfunction [with] father as it relates to co-parenting concerns" over Alison. During visits, mother (and the monitor, mother's sister) would regularly interrogate Alison about what father and his girlfriend were doing, and call father an "asshole," an "evil person," and a "motherfucker." During one visit, mother "went off" on Alison after Alison referred to father's girlfriend as "mom." When father was late bringing Alison to a visit in October 2020 (due to a fatal accident that closed down a freeway), mother told Alison to call father an "asshole," and both mother and the maternal aunt proceeded to cuss out father when he finally arrived.

Mother's behavior had negative effects on Alison—she was "undu[ly] stress[ed]" by mother's conduct, wet her bed when the visits with mother approached, and had nightmares.

In light of mother's continued conduct and the maternal aunt's inappropriate behavior as a monitor, the juvenile court in November 2020 ordered that all further visitation occur in a therapeutic setting.

**D.** *Section 364 hearing*

1. *The Department's position*

The Department's position on whether the juvenile court should terminate jurisdiction under section 364 changed over time. In reports filed on August 6, 2020, and September 2, 2020, by social worker S. Anastasiya Alexander, the Department recommended that the juvenile court allow another three months of services (through November or December 2020). In a report

6

filed on November 4, 2020, by social worker Ashley Ruiz, the Department recommended that the juvenile court terminate its jurisdiction and issue an exit order granting father sole legal and physical custody of Alison and requiring all communication between mother and father to be through a court-ordered online platform.

> 2.  *Contested hearings*

At the request of both mother and father, the juvenile court held a contested hearing that took place over the course of December 8, 10, and 22, 2020.

At the outset of the contested hearing, the Department reaffirmed its November 4, 2020 position that the juvenile court terminate dependency jurisdiction and award father sole legal and physical custody of Alison.

Mother called two witnesses—namely, (1) the psychiatrist who evaluated mother and prescribed her medication, and (2) mother's therapist. The Department called social worker Ruiz. Ruiz relayed that Alison was "fearful" that mother might hurt father and his girlfriend and that Alison felt "safe and comfortable in father's home."

After entertaining argument from the parties, the court stated that it "intend[ed] to terminate" dependency jurisdiction over Alison, but wanted to have maternal uncle assessed as a monitor "to avoid further problems." The court set the matter for a further hearing to give the Department time to investigate the maternal uncle's suitability as a monitor.

> 3.  *Further reports from the Department*

The Department filed two further reports—on December 18, 2020, and on December 22, 2020. Both were prepared by social worker Gabriela Cortez.

In the December 18 report, Cortez (1) reported that Alison's therapist relayed that Alison "would like to see her mother on a weekly basis" and further opined that Alison would be "okay to have weekly monitored visits" with mother "if . . . mother can contain herself and restrain [herself] from questioning the minor during visit[s] about . . . father and . . . father's [girlfriend]," and (2) recommended that the exit order grant father "sole physical custody" of Alison, grant both parents "joint legal custody" of Alison, and specify "monitored weekly visits" for mother.

In the December 22 report, Cortez relayed that after "careful consideration" and after further review of the November 4, 2020 report documenting the "stress and anxiety" Alison experiences "during the visitations with" mother, she recommended that the exit order grant father "sole legal and physical custody" of Alison and specify twice-monthly monitored visits for mother.

4. *Further hearing*

At the outset of the December 22, 2020 hearing, mother acknowledged that the juvenile court had already made its "decision and findings" regarding termination of dependency jurisdiction, but asked to "set a trial" regarding the "terms" of the exit order and, more specifically, why the Department's recommendation changed from weekly to biweekly visits. Mother sought to call Alison's therapist, social worker Cortez, and Alison to examine them as to why Cortez's second recommendation of semimonthly monitored visits is "different than [Alison's] therapist['s]" blessing of weekly monitored visits. The juvenile court denied mother's request, ruling that the purpose of the continued hearing was "to simply work out final details of the

8

monitor" and that the court would not require Alison to "suffer[]" by being called as a witness.

The court proceeded to terminate dependency jurisdiction over Alison, finding that the "[c]onditions which justif[ied] initial assumption of jurisdiction . . . no longer exist[] and [are] not likely to exist if [juvenile court] supervision is withdrawn." The court then issued an exit order (1) awarding father sole legal and physical custody over Alison, in part because "mother's psychiatric and emotional conditions [do not] lend [mother] to work cooperatively with other people," which is essential for joint legal custody over a child, and (2) specifying there would be monitored visits "every other week."

### E.   *Appeal*

Mother filed this timely appeal.

## DISCUSSION

Mother argues that (1) the juvenile court's order terminating dependency jurisdiction over Alison is not supported by substantial evidence, and (2) the juvenile court's exit order is defective because (a) the court violated mother's due process rights by denying her request to call Alison's therapist and the Department's new social worker,[3] and (b) the court abused its discretion in awarding father sole legal custody and in specifying biweekly (as opposed to weekly) visitation.

## I.   Order Terminating Dependency Jurisdiction

Where, as here, the juvenile court has not removed a child from the parents having physical custody over the child (who, by virtue of the parents' informal arrangement in this case, was both parents), section 364 provides that the court "shall terminate its

---

[3]   Mother does not argue she should have been able to call Alison.

9

jurisdiction" unless the Department or the parent "establish[] . . . that the conditions still exist which would justify initial assumption of [dependency] jurisdiction" or "are likely to exist if [juvenile court] supervision is withdrawn." (§ 364, subds. (a) & (c); *In re T.S.* (2020) 52 Cal.App.5th 503, 512-513; *In re J.F.* (2014) 228 Cal.App.4th 202, 210 [any "conditions" that "would" justify jurisdiction suffice].) By specifying that the court "'shall'" terminate jurisdiction "'unless'" "'conditions still exist,'" section 364 erects a "'statutory presumption'" in favor of termination. (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1155 (*Aurora P.*), italics omitted.) Where, as here, the Department is seeking termination and the parent seeks to overcome the statutory presumption, the parent bears the burden of proving the propriety of continued dependency jurisdiction. (*Id.* at p. 1162.) Because we review a juvenile court's order terminating jurisdiction for substantial evidence, mother—as the parent who bore the burden of proof below—bears the very heavy burden of establishing that the record *compels* a finding, as a matter of law, that the "conditions" which "would justify initial assumption" of jurisdiction "still exist" or are "likely to exist." (*Id.* at pp. 1156, 1163; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

The record does not compel a finding that the conditions justifying the juvenile court's initial assumption of jurisdiction over Alison still exist or are likely to exist. The court's assumption of jurisdiction rested on its findings that mother and father engaged in domestic violence and that mother had mental and emotional issues, all of which put Alison at substantial risk of serious physical harm. By entry of an exit order granting

10

father sole physical and legal custody over Alison, the chief harm Alison suffered—being exposed to mother's obsessive behavior toward father and father's girlfriend—has been entirely ameliorated because Alison is now fully insulated from being exposed to any unmonitored interactions between mother and father. (See *In re Destiny D.* (2017) 15 Cal.App.5th 197, 208 [termination of jurisdiction appropriate where restrictions imposed in exit order ameliorates risk of harm].) What is more, the record indicates that Alison is happy and healthy in father's sole custody.

Mother responds with what boil down to four arguments. First, mother urges that we should be "troubled" by the juvenile court's fitness because, on two occasions, the court mistakenly substituted for mother's name the names of two other people (in one instance, the supervisor of mother's therapist and in another, one of mother's other children). However, the juvenile court's momentary slips of the tongue provide no basis for questioning the court's judgment. Second, mother asserts that Alison was happy living with mother before the juvenile court's involvement. However, this assertion ignores that, prior to the Department's involvement, mother lit herself on fire in front of Alison and repeatedly told Alison that her father no longer loved her—both of which upset Alison. This assertion also ignores that Alison expressed how she quickly learned, once residing full time with father, that mother's ploys to get her not to like father were untrue. Third, mother contends that she completed most of her case plan insofar as she finished the mandatory courses, was taking her psychiatric medication, and was making some progress in her individual therapy, such that it was inappropriate to terminate jurisdiction. However, this contention is directed at

11

mother's efforts to reunify with Alison but section 364 is concerned with whether the conditions warranting jurisdiction still exist or are likely to exist and is "'not concerned with reunification.'" (*Aurora P.*, *supra*, 241 Cal.App.4th at p. 1155, quoting *In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20; *In re Armando L.* (2016) 1 Cal.App.5th 606, 615 (*Armando L.*).) Lastly, mother points out that the court did not focus on father's progress in his case plan or on the fact that the volatile situation was caused by mother and father *together*. However, these points do not focus on the salient question—namely, whether walling off Alison from unmonitored contact with mother removes the conditions giving rise to the need for juvenile court supervision; it does, so jurisdiction is no longer necessary. At bottom, we must reject mother's urging to reweigh the evidence. (*In re J.F.* (2014) 228 Cal.App.4th 202, 209.)

## II.   Validity of Exit Order

### A.   *Denial of due process*

The guarantee of due process to "adequate notice and an opportunity to be heard" applies to parents in juvenile dependency proceedings. (*In re B.G.* (1974) 11 Cal.3d 679, 688-689; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 222 (*Dakota H.*); *David B. v. Superior Court* (2006) 140 Cal.App.4th 772, 777.) Due process is a "flexible concept" (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 536 (*J.H.*)), and as pertinent here assures a parent (1) the right to present "relevant evidence of significant probative value to the issue before the court" (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817 (*Jeanette V.*); *In re Thomas R.* (2006) 145 Cal.App.4th 726, 733), and (2) a less-than-"'full-fledged'" right to confront and cross-examine witnesses (*J.H.*, at p. 536; *Armando L.*, *supra*, 1 Cal.App.5th at pp. 620-621).

12

Mother argues that the juvenile court violated her due process rights by not allowing her to call as a witness and to cross-examine the social worker who authored the December 18 and 22 reports and Alison's therapist on the topics of (1) why the social worker changed her recommendation from joint legal custody and weekly monitored visits in the December 18 report to sole legal custody for father and semimonthly monitored visits in the December 22 report, and (2) why she in the December 22 report disagreed with Alison's therapist's recommendation—set forth in both reports—that Alison would be "okay" with weekly visits.  Our standard of review is not entirely clear:  Although claims that a juvenile court improperly denied a parent a contested hearing or denied a parent's request to reopen the evidence are reviewed for an abuse of discretion (*In re Grace P.* (2017) 8 Cal.App.5th 605, 611 [denial of contested hearing]; *In re Mary B.* (2013) 218 Cal.App.4th 1474, 1481 [denial of request to reopen]; *Guardianship of Phillip B.* (1983) 139 Cal.App.3d 407, 428 [same]), mother is raising a due process claim, which is a legal question to be reviewed de novo (*In re A.B.* (2014) 230 Cal.App.4th 1420, 1434).  In an abundance of caution, we will apply the higher standard is—that is, de novo—in reviewing mother's arguments.

1. *Changes in custody recommendation*

The juvenile court did not deny mother due process by denying her request to call the social worker to ask why the worker's recommendation regarding legal custody over Alison changed, and we so conclude for two reasons.

First, this claim is not properly before us because mother likely forfeited this objection.  (*Dakota H.*, *supra*, 132 Cal.App.4th at p. 222 [due process claims may be forfeited if not raised

13

below].)  Although mother initially asked to "set a trial" "on the terms" discussed in the Department's December 18 and 22 reports, mother went on only to argue about why the Department's recommendation regarding the frequency of visits had changed and conflicted with the recommendation made by Alison's therapist.  Mother's failure to explain why further evidence was needed on the question of the custody recommendation likely constitutes a forfeiture.

Second, even if we ignore this likely forfeiture, the juvenile court did not deny mother due process by precluding her from calling the social worker because that denial did not rob the court of "relevant evidence of significant probative value." (*Jeanette V.*, *supra*, 68 Cal.App.4th at p. 817.)  In the December 22 report, the social worker already explained why she changed the recommendation—namely, that she looked more closely at the earlier reports and, after examining them in their totality, determined that the best way to alleviate the concerns that gave rise to dependency jurisdiction was to eliminate the interaction between mother and father (and the stress it caused Alison) by eliminating the need for the parents to interact when making legal decisions about Alison.  Further, the predecessor social worker who previously recommended (in the November 4 report) an exit order awarding father sole legal custody of Alison did testify at the hearing, the Department's attorney advocated at the hearing to award father sole legal custody of Alison, and mother elected not to question the social worker about the Department's position.  Finally, the social worker's recommendations (on behalf of the Department) are just that— recommendations that the juvenile court is free to disregard.  (*In re Aurora P.*, *supra*, 241 Cal.App.4th at p. 1155.)  In sum,

14

questioning the most recent social worker would not have produced any evidence of "significant probative value," so its exclusion did not deny mother due process.

2. *Frequency of mother's visitation*

The juvenile court did not deny mother due process by denying her request to call the social worker and Alison's therapist to have the social worker explain why her December 22 recommendation of semimonthly visits differed from her earlier recommendation and the therapist's opinion that "weekly monitored visits" would be "okay" "if the mother can contain herself and restrain [herself] from questioning the minor during visit[s] about . . . father and . . . father's [girlfriend]." Mother does not explain what, if anything, the therapist's reaffirmance of her opinion would add. Again, the preclusion of this evidence did not rob the court of "relevant evidence of significant probative value." (*Jeanette V.*, *supra*, 68 Cal.App.4th at p. 817.) Calling the social worker would not likely have added anything because (1) the social worker's December 22 report already explained why she changed her recommendation regarding the frequency of visits—namely, that her further review of the reports highlighted the "stress and anxiety" Alison felt during and after visits with mother, such that fewer visits meant less anxiety, and (2) the social worker's ultimate recommendation was consistent with the therapist's *qualified* approval of weekly visits because the evidence the social worker reviewed indicated that—as recently as October 2020—mother was still obsessed with father and father's girlfriend.

3. *Mother's further due process arguments*

Sprinkled throughout her appellate briefs, mother suggests that she was denied due process because the Department's entire

15

handling of her case is suspect due to (1) the "rapid succession of different social workers" on her case, and (2) an alleged plethora of "inaccurate statements" in the Department's reports, including a misrepresentation in one report that mother's psychiatrist had opposed unsupervised visits. We reject these arguments outright. Due process does not dictate how state agencies staff their cases. What is more, the record is clear that several of the staff changes were due to mother's objections to the assigned social workers. Nor were any alleged inaccuracies in the Department's reports sufficiently material or numerous to call into question the integrity of the Department's operations in general or, more importantly, the evidence supporting the juvenile court's orders. At best, the Department's report regarding the opinion of mother's psychiatrist on unmonitored visits is vague, but that opinion does not matter because the court's orders are supported by substantial evidence even in the absence of any report from mother's psychiatrist.

### B. *Propriety of the exit order's terms*

A juvenile court terminating jurisdiction under section 364 may also enter an "exit order" fixing custody and visitation. (§ 362.4; *In re T.H.* (2010) 190 Cal.App.4th 1119, 1122-1123.) Mother argues that the juvenile court erred (1) in awarding father sole legal custody and (2) in specifying biweekly visits. We review the terms of the exit order for an abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

The juvenile court did not abuse its discretion in awarding father sole legal custody of Alison. When determining which parent(s) should have custody of a child in an exit order, the juvenile court is to "focus" on "the best interests of the child," and may make its determination regardless of the "preferences or

16

presumptions" in favor of joint custody that may apply outside the dependency context.  (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 711-712.)  Here, the juvenile court awarded sole legal custody of Alison to father because joint custody requires parents to work together to make decisions for their child and because mother has not exhibited the ability to communicate with father.  The court's findings are supported by the record, which document a "continued communication dysfunction [with] father as it relates to co-parenting concerns" over Alison.

The juvenile court also did not abuse its discretion in fixing biweekly visitation (rather than weekly).  The record amply supports the court's implicit findings that less frequent visits would be less harmful to Alison in light of mother's continued obsession with father and his girlfriend, and the multifarious ways in which mother manifests her obsession when Alison is with her.  We also note that the exit order is subject to modification by the family court in the event mother demonstrates a "significant change of circumstances."  (§ 302, subd. (d), 362.4, subd. (b); *Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1163.)

Mother responds with three arguments.  First, she argues that she and father worked together without issue for eight years prior to this case, and, at oral argument, added that there were no reported incidents between November and December 2020.  This argument ignores how mother's amicability deteriorated significantly once father started dating his girlfriend and that he is *still* dating her and ignores how the absence of any incidents in November and December 2020 is of little weight because the court had in early November 2020 ordered all visits to be in a therapeutic setting, which was designed specifically to prevent

any incidents from occurring.  Second, mother argues that Alison's therapist reported that Alison wanted weekly visits and that the therapist opined that weekly visits were "okay."  This argument ignores that Alison's wishes, while relevant, are not dispositive, and that the therapist's opinion was *conditioned* on mother's ability to "contain herself and restrain [herself] from questioning the minor during visit[s] about . . . father and . . . father's [girlfriend]"—a condition that the record shows mother has yet to meet.  Lastly, mother argues that the Department changed its position regarding the frequency of visitation.  This argument ignores that the Department explained its shift in position, as noted above.

## DISPOSITION

The orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, P. J.

LUI


_____, J.

CHAVEZ